# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Ramirez, 2013 IL App (4th) 121153**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESUS RAMIREZ, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-1153 |
| Filed | October 4, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court upheld defendant's convictions for attempted first degree murder, armed violence, and possession with intent to manufacture-deliver a controlled substance over defendant's contentions, *inter alia*, that his "motion to quash arrest" was improperly denied and that permitting an officer to testify about what he saw on a video recording was plain error, since the motion did not correctly state its purpose or identify the evidence sought to be suppressed and it did not show how the search and seizure was unlawful; further, defendant failed to show that the plain error doctrine applied, particularly where defendant's counsel did not object at trial and invited more testimony on the video during cross-examination of the officer and invited errors are not subject to plain error review. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 11-CF-28; the Hon. Patrick W. Kelley, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Sam Adam, and Samuel E. Adam and Josh Niewoehner, both of
Henderson Adam, both of Chicago, for appellant.

John Milhiser, State's Attorney, of Springfield (Patrick Delfino, Robert
J. Biderman, and Anastacia R. Brooks, all of State's Attorneys Appellate
Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE STEIGMANN delivered the judgment of the
court, with opinion.
Justice Turner concurred in the judgment and opinion.
Justice Pope specially concurred in the judgment, with opinion.

**OPINION**

¶ 1      In September 2012, a jury convicted defendant, Jesus Ramirez, of two counts of attempt (first degree murder) (720 ILCS 5/8-4, 9-1(a)(1) (West 2010)), armed violence (720 ILCS 5/33A-2 (West 2010)), and possession with intent to manufacture-deliver a controlled substance (more than 900 grams of a substance containing cocaine) (720 ILCS 570/401(a)(2) (West 2010)). The trial court later sentenced defendant to an aggregate 90 years in prison.

¶ 2      Defendant appeals, arguing that (1) the trial court erred by not granting his "motion to quash arrest"; (2) plain error was committed when the trial court permitted a police officer to testify about what he saw on a video recording; and (3) the State failed to prove him guilty beyond a reasonable doubt of attempt (first degree murder). We disagree and affirm.

¶ 3                      I. BACKGROUND

¶ 4      In January 2011, the State charged defendant as earlier stated. The two attempt (first degree murder) charges arose from defendant's pointing a loaded handgun at each of two uniformed police officers and pulling the trigger.

¶ 5            A. Defendant's "Motion To Quash Arrest"

¶ 6      In May 2011, defendant filed a motion "pursuant to 725 ILCS 5/114-12 [(West 2010)]," requesting the trial court to "quash the defendant's arrest." That motion, in its entirety, reads as follows:

"1. The defendant was detained and arrested by officers of the McLean County Police Department at approximately 1:35 a.m. on the 13th day of January, 2011.

2. The detention, arrest and seizure of the defendant were without exigent

circumstances, without a warrant, and without consent and were, therefore, illegal.

3. At the time of his arrest and/or detention, the defendant was not observed in the commission of a crime, nor did the police have probable cause to believe the defendant had committed a crime.

4. Said police officers did not have reasonable grounds to believe that a warrant for the arrest of the defendant had been issued in this State or in any other jurisdiction.

5. That the arrest and/or detention of the defendant violated the defendant's rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I of the 1970 Constitution of the State of Illinois.

WHEREFORE, the [d]efendant *** prays this honorable court to find that his arrest and/or detention was illegal, because of the absence of authority or probable cause to effect it, and to allow his Motion to Quash Arrest."

¶ 7    In June 2011, the trial court began a hearing on defendant's "motion to quash arrest." (We note that neither the court nor the prosecutor raised any question regarding either the appropriateness or the sufficiency of that motion.)

¶ 8    Defendant's sole witness was Officer Kent Hair of the Chenoa police department. Hair testified that in the early morning hours of January 13, 2011, he saw a dark-colored sports utility vehicle (SUV) drive past him in the south lanes of Interstate 55 (I-55) without a rear registration plate light. Hair followed the SUV and ultimately stopped it by turning on his overhead lights, which also turned on the police car's dashboard-mounted video recorder. Hair reviewed the video recording and confirmed that it accurately portrayed what happened during the traffic stop. Based on the parties' agreement, the trial court viewed the video recording.

¶ 9    Hair testified that after he stopped the SUV, he walked to the passenger side and spoke with the driver and passenger to tell them why he had stopped them. Hair asked for the driver's identification and the SUV's registration. The driver identified himself as Jamaris Torbert. The passenger, defendant, said the SUV was his, so Hair asked for his identification as well. Hair then did a computer check and learned that (1) neither Torbert nor defendant had any outstanding arrest warrants and (2) Torbert had a valid driver's license.

¶ 10    Hair asked Torbert to get out of the SUV and then showed him the defective light over the rear registration plate. Hair noticed that both Torbert and defendant were very nervous, would not make eye contact, and were visibly shaking as he spoke to them.

¶ 11    During his conversations with Torbert and defendant, Hair asked them whether the SUV contained drugs or anything illegal. They both answered, "No." Hair explained that whenever he stops a car, whether for a speeding ticket or a written warning for a defective registration light, he is always looking for narcotics. If a canine unit had been available, he would have requested one. Instead, Hair asked Torbert to accompany him to his police car, intending simply to write Torbert a warning ticket for the registration light and let him leave. As he wrote the warning ticket, Hair wanted defendant to stay in the SUV's passenger seat so he could not make any threatening moves toward Hair.

¶ 12    As Torbert sat in Hair's police car, waiting for Hair to issue the warning ticket, defendant

moved from the SUV's passenger seat to driver's seat and drove off. The video recording showed defendant's movement as well as the ensuing chase.

¶ 13        The State and defendant filed written memoranda in support of their respective positions regarding defendant's "motion to quash." Defendant asserted that the initial traffic stop was not valid because, despite Hair's testimony, "the videotape of the stop clearly [showed] that the rear registration light was illuminating the license plate." Defendant further contended, citing *People v. Sinclair*, 281 Ill. App. 3d 131, 666 N.E.2d 1221 (1996), that "after the illegal stop," he was "unlawfully detained by officer Hair." Defendant based this contention upon the fact that he "was not free to leave the scene nor was he free to exit the vehicle" during the time that Hair was writing Torbert the warning ticket in the police car. We note that defendant concluded his memorandum with the following prayer for relief: "WHEREFORE, the defendant prays this honorable court to grant the motion to quash the arrest of the defendant."

¶ 14        In the State's response, the State asserted that the traffic stop was valid based upon Hair's testimony. The State also contended that when a vehicle is stopped due to a traffic violation, the police have a right to detain all occupants of that vehicle, including the driver and all passengers.

¶ 15        The trial court denied defendant's motion, explaining that the court accepted Hair's testimony that the light on the license plate was out. The court noted that the video recording was not inconsistent with that conclusion, "given the reflective nature of license plates and the fact that the police car [with its lights on] was directly behind the vehicle in question at the time of the stop."

¶ 16        Regarding defendant's claimed detention, the trial court noted that the officer invited Torbert back to speak with him in the police car. To the extent that defendant was detained, it was because he was a passenger in the car as the officer spoke to Torbert. (The record shows it was a cold winter's night and the SUV was then parked on the shoulder of a rural portion of I-55.)

¶ 17                              B. Defendant's Jury Trial

¶ 18        The pertinent evidence introduced at defendant's jury trial follows.

¶ 19        Wendee Ramirez testified that she was married to defendant in January 2011, and she owned the SUV. As of January 2011, she and defendant had been either married or living together for approximately 10 years. During that time, she never saw defendant in possession of any guns.

¶ 20        Hair testified consistently with his testimony at defendant's "motion to quash arrest" hearing, adding that he asked Torbert if he had anything illegal inside the vehicle, like illegal narcotics or guns. Torbert responded, "No." Leaving Torbert at the rear of the SUV, Hair walked to the passenger side and asked defendant the same question. Defendant likewise said no. Hair also spoke to defendant about having a canine come to the location of the stop.

¶ 21        As Torbert sat in Hair's police car, defendant sped away in the SUV. Hair followed him for approximately 25 miles, traveling around 90 miles per hour. As Hair chased the SUV, he

was in radio contact with other law enforcement agencies. The video recording from Hair's police car was played for the jury.

¶ 22    Other police officers from various central Illinois law enforcement agencies testified about being part of the pursuit of the SUV. Sergeant Nathan Scott of the Williamsville police department testified that he joined in the chase on I-55 and saw the SUV make a sharp turn onto the off-ramp at the Stevenson Drive exit into Springfield, Illinois. Scott's police car and other police cars followed the SUV onto the off-ramp, where it lost control, went into a spin, and ended up stopping in the snowy median between the on-ramp and the off-ramp for Stevenson Drive.

¶ 23    Scott's vehicle stopped about a car length behind the SUV and a police vehicle. Scott observed defendant get out of the driver's side of the SUV with a silver handgun in his hand. He pointed the gun toward Deputy Dickason, who was getting out of his police car. As this happened, Scott was approximately 25 feet away. Defendant ran up to Deputy Dickason as the deputy was exiting the police car, pointed the pistol at him, and "attempted to fire the gun." Scott explained as follows: "[Defendant's] hand–his finger was in the trigger, on the trigger, and when he attempted to pull the trigger, the gun malfunctioned, and I could tell he was trying to fire the gun because he was anticipating the recoil."

¶ 24    Scott explained that he was familiar with handguns and had received training regarding them. He was his department's range officer. Scott explained further the concept of "anticipating a recoil," as follows: "That's when you–pretend my hand has got a gun in it, and you go to fire, you jerk anticipating that there is going to be recoil action against your hand (indicating), and that's anticipating the recoil."

¶ 25    Scott testified that the gun appeared to malfunction. Defendant looked down at the gun and then ran in between Scott's police car and the back side of the deputy's vehicle. As he did so, defendant was "racking the slide back, attempting to chamber a round." Scott estimated the distance between defendant and the deputy at the time defendant attempted to fire the gun as under three feet.

¶ 26    Defendant ran toward the Drury Inn hotel, with several officers in pursuit. At no time did defendant's weapon discharge, nor did the officers ever discharge their weapons. As Scott approached the hotel, he saw defendant standing near its entrance with his handgun pointed to his chin. As the officers talked to defendant, he threw his handgun down and surrendered.

¶ 27    Scott testified that he had an in-car camera that recorded his involvement in the chase of the SUV. He said his camera was operating early that morning, and the video recording he saw accurately depicted what he observed that night. The video recording, which contained no audio, was then played for the jury.

¶ 28    Sergeant Christopher Russell of the Springfield police department testified that he participated in the effort to stop the SUV by driving to the on-ramp to I-55 from Stevenson Drive. His purpose was to keep people from entering onto I-55 southbound in front of the pursuit.

¶ 29    Russell observed the SUV traveling southbound at a high rate of speed. The driver tried to take the Stevenson Drive exit ramp off that highway, but the SUV started spinning and went off the exit ramp.

¶ 30    Russell got out of his police car on the driver's side, drew his weapon, and pointed it at the SUV. As Russell did so, the driver's door opened and the suspect got out. He "side-stepped a little bit, and then pointed a silver or chrome handgun at [Russell]." As the suspect did so, a county deputy's vehicle pulled up, so Russell could not discharge his firearm because the deputy was "behind where [his] line of sight was." The driver then turned, ran directly toward the deputy's location and pointed his gun at the deputy. Russell watched as the suspect jumped a fence, heading toward the hotel.

¶ 31    Dickason joined Russell in chasing after the suspect, who ran up to the hotel. Russell saw defendant put the gun to his head while other officers were telling him to put the gun down. Defendant ultimately threw his gun down and gave up.

¶ 32    Russell testified that he did not see the defendant pull the trigger when defendant pointed the gun at him, nor did he see defendant rack his weapon. Russell observed all of that only later when he watched the video, as he also did with regard to defendant's pointing the gun at Dickason and pulling the trigger.

¶ 33    Deputy Dickason of the Sangamon County sheriff's department testified that he participated in the chase on I-55 of the SUV and followed that vehicle onto the Stevenson Drive exit ramp. Dickason parked his police vehicle to block in the SUV where it had come to a stop in a snowy area next to the exit ramp. As Dickason started to get out of his police car, he saw defendant come from around the back of the SUV. Dickason yelled at him to get on the ground, but defendant continued to run toward him and raised a silver handgun as he approached. Dickason testified that defendant "attempted to pull the trigger as he was pointing it at me." At that point, defendant was only five to seven feet away, and Dickason was able to see defendant pulling the trigger. Nothing happened, although Dickason testified that defendant "looked like as he was pulling the trigger, he was bracing for the recoil."

¶ 34    After defendant pulled the trigger and nothing happened, Dickason observed that defendant "racked it–the slide back in order to–which causes another round to come into the chamber." Defendant was looking at the gun as he did so. Defendant then ran from the scene, and Dickason drew his weapon and chased defendant toward the hotel. When defendant got to the hotel, he stopped running, and with several police officers yelling at him, he ultimately gave up and threw his gun away. Before doing so, Dickason observed defendant attempt multiple times to shoot himself.

¶ 35    After defendant's arrest, Dickason returned to his police car, where he had a drug-sniffing dog. He got the dog out and had it sniff around and in defendant's SUV. After the dog "hit on the back rear seat" of the vehicle, Dickason opened the trunk area and found a box of illegal narcotics.

¶ 36    Sergeant Tim Mazrim of the Sangamon County sheriff's department testified that he was involved in the chase of the SUV down I-55 at speeds that occasionally reached 100 miles per hour. Mazrim saw defendant point his silver handgun at his chest and his head. Mazrim also saw defendant "racking the slide or basically putting a hand on the semi-automatic and he's racking the slide, basically putting a round into the chamber." Mazrim explained that what he was doing appeared to be a malfunction drill on a semiautomatic weapon. "Basically, [that's when] we take like a tap and rack, make sure the magazine is seeded, and

you move the slide to [e]nsure that the bullet is seeded and the weapon's going to go off." He explained that the purpose of racking the slide is to chamber a round into the weapon to make it ready to fire.

¶ 37　After defendant's arrest, Mazrim noticed a live 9-millimeter bullet lying near him that the police collected as evidence.

¶ 38　A guest who was staying at the hotel in January 2011 testified that on the evening of January 13, he found a 9-millimeter round lying in the hotel's driveway near its main entrance. He picked up the round and gave it to hotel personnel, who ultimately turned it over to law enforcement authorities.

¶ 39　Deputy James Hayes of the Sangamon County sheriff's department picked up the gun defendant threw to the ground, which he identified as a Smith and Wesson 9-millimeter. Hayes found one live round in the chamber and nine rounds in the magazine. Hayes testified that when he picked the gun up off the ground, the safety was on. He explained that the gun had "a decocker lever, and that it was in the decock position." He explained that this lever is called a "safety" by laypeople, and when it was in the decock position, the gun would not fire.

¶ 40　A forensic scientist with the Illinois State Police crime lab specializing in firearm tool mark identification testified that she tested the gun and found that its magazine's capacity was 15 rounds plus 1 in the chamber. She determined that some of the cartridges shown to her had been in the gun ready to be fired. She also explained the general operation of the gun with the safety both on and off.

¶ 41　Another forensic scientist testified that she examined the contents of the box retrieved from defendant's vehicle and concluded that the substance was cocaine of a high purity. The substance weighed just under 1,000 grams.

¶ 42　Defendant was the only witness to testify on behalf of the defense. He explained that his father and older brother taught him about guns and how to use them carefully. He was familiar with safeties on handguns.

¶ 43　Defendant testified that he did not know Torbert before Torbert called him to be a driver for defendant to travel back to Springfield. Torbert was a cousin of one of defendant's friends. Defendant wanted Torbert to drive because defendant did not have a valid driver's license.

¶ 44　When the police pulled over the defendant's SUV near Chenoa, Torbert told defendant that Torbert had a gun. As Torbert tried to reach for his gun, he dropped it, then picked it up, and put it in the SUV's center console.

¶ 45　Defendant did not know there were any drugs in the SUV, but he panicked when he saw Torbert take a seat in the police car because defendant "wanted to see [his] kids." So he moved from the passenger's seat to the driver's seat and drove away. When he reached Springfield, the SUV came to a stop when he spun out of control. Because he panicked, he grabbed the gun, but he made sure the safety was on because he did not want anybody to get hurt.

¶ 46　When he got out of the SUV, he pointed the gun because he "wanted the officer to duck

down so [he] could get away." When he pointed the gun, he was not trying to kill anyone, and he did not pull the trigger. He admitted that he also pointed the gun at another officer but it was for the same reason–"[he] wanted him to get out of [his] way and duck." He did not pull the trigger that time, either.

¶ 47    He admitted that he racked the gun, "but not with intent to kill anyone or shoot anybody or hurt anybody." He explained that he racked the gun "[b]ecause I wanted them to think that I was serious."

¶ 48    When he got to the front of the hotel, the gun's safety was still on. Defendant knew the safety was on from the moment he got out of the car, and he never took it off. He admitted pointing the gun at himself at the hotel but could not explain why. He testified that he was not trying to kill himself.

¶ 49    On this evidence, the jury convicted defendant as stated. The trial court sentenced defendant to 70 years in prison on each conviction of attempt (first degree murder) and 30 years in prison on the conviction of possession with intent to manufacture-deliver a controlled substance. The court ordered those sentences to run concurrently with each other. The court also sentenced defendant to 20 years in prison on his conviction of armed violence and ordered that sentence to run consecutively to the other three sentences, for an aggregate sentence of 90 years in prison.

¶ 50    This appeal followed.

¶ 51                                              II. ANALYSIS

¶ 52    Defendant argues that (1) the trial court erred by not granting his "motion to quash arrest"; (2) plain error was committed when the court permitted a police officer to testify about what he saw on a video recording; and (3) the State failed to prove him guilty beyond a reasonable doubt of attempt (first degree murder). We address defendant's arguments in turn.

¶ 53                              A. Defendant's "Motion To Quash Arrest"

¶ 54    Defendant contends that his arrest was illegal because the car in which he was a passenger was stopped for a traffic arrest and he was not free to leave. Thus, he argues that his "motion to quash arrest" should have been granted.

¶ 55                          1. *"Motions To Quash Arrest" Generally*

¶ 56    Throughout this opinion, we have advisedly put the term "motion to quash arrest" in quotation marks so as to avoid giving any legitimacy to such a motion. In fact, such motions possess none. "Motions to quash arrest" are nowhere recognized in the Code of Criminal Procedure of 1963 (Code) (see 725 ILCS 5/100-1 through 122-7 (West 2010)). Defendant's "motion to quash arrest" stated that it was being made pursuant to section 114-12 of the Code (725 ILCS 5/114-12 (West 2010)), but that is clearly wrong. That section, which is entitled "Motion to Suppress Evidence Illegally Seized," sets forth the procedure to be used when a defendant, who is "aggrieved by an unlawful search and seizure," seeks to suppress the

evidence that the police obtained as the result thereof. 725 ILCS 5/114-12(a) (West 2010). That section contains no reference to "quashing arrests."

¶ 57 This court recently had occasion to discuss why the filing of a "motion to quash arrest" makes no sense. In *People v. Hansen*, 2012 IL App (4th) 110603, ¶¶ 62-63, 968 N.E.2d 164, we wrote the following:

"[D]efendant entitled his motion a motion to 'quash arrest.' The proper title for such a motion is 'motion to suppress evidence.' *** Defendant was not asserting, nor should the court have found, that his arrest was void. See Black's Law Dictionary 1278 (8th ed. 2004) (to quash means '[t]o annul or make void'). Instead, what defendant was asserting *** was that the arresting officer improperly stopped defendant's vehicle because he did not have reasonable suspicion to do so. When an improper traffic stop occurs, the appropriate remedy is to suppress the evidence obtained as a result on the ground that use of such evidence is a violation of the defendant's constitutional rights.

Suppressing the evidence obtained by the police as a result of an improper stop is the entirety of the relief to which a defendant is entitled. That is also the only relief provided for in section 114-12 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-12 (West 2010)), which is entitled, 'Motion to Suppress Evidence Illegally Seized.' Nothing in that section refers to or deals with purported 'motions to quash arrest.' Because such motions (1) are unnecessary to achieve a defendant's goal of suppressing evidence, (2) add nothing to an analysis of whether a motion to suppress based upon an allegedly illegal search or stopping (as here) should be granted, and (3) can only add confusion to such an analysis (after all, if a 'motion to quash arrest' is granted, what relief does a defendant obtain beyond the suppression of the evidence in question due to the grant (as in this case) of defendant's motion to suppress?), defendants should stop filing such motions and should instead file only motions to suppress evidence."

¶ 58 Apparently, as in *Hansen*, what defendant in the present case intended was a motion to suppress based upon his allegedly illegal detention. However, because defendant's motion was deficient (aside even from its inappropriate title), we will point out what such motions should contain.

¶ 59 Motions to suppress filed pursuant to section 114-12 of the Code must clearly set forth *at a minimum* the following:

(1) **The title of the motion should be motion to suppress evidence.** That title will put both the State and the court on notice of the motion's purpose.

(2) **The motion to suppress must clearly identify the evidence sought to be suppressed.** Although this requirement is not set forth explicitly in section 114-12 of the Code, its presence is clearly evident. Before conducting a hearing on the motion, the parties and the court must know what evidence is at issue. (As Professor LaFave has written, "[t]he motion, which in many jurisdictions must be made in writing, must of course identify the items which the defendant seeks to suppress." 6 Wayne R. LaFave, Search and Seizure § 11.2(a), at 42 (5th ed. 2012).) Experience shows that when the admissibility of a particular piece of evidence is challenged in a motion to suppress, the

State will occasionally concede the motion by indicating that to avoid a problem, the State will not offer that evidence in its case in chief. In any event, both parties and the court need to know the evidence that is the focus of the motion if for no other reason than to determine the relevancy of the evidence offered at the hearing on the motion.

(3) **The motion must state facts showing wherein the search and seizure were unlawful.** 725 ILCS 5/114-12(b) (West 2010).

¶ 60  In support of the above discussion of section 114-12 of the Code, we agree with the following analysis:

"A motion to suppress is, in effect, a pleading to the extent that it frames the issues to be determined in a pretrial hearing on the motion. The fundamental role of a pleading is to give an opposing party notice of the pleader's position concerning the facts and law so that the opposing party can begin to prepare his defense. A pleading thus both defines and limits the areas of consideration at a trial or other evidentiary hearing ***, by enabling the court to determine the relevance of offered evidence." *State v. Johnson*, 519 P. 2d 1053, 1057 (Or. Ct. App. 1974).

¶ 61  Last, regarding the subject of "motions to quash arrest" generally, we note that the use of such motions has apparently not come to the attention of Professor LaFave despite his more than 50 years on the faculty of the University of Illinois College of Law and his authorship of the nation's definitive treatise on the subject of search and seizure. That treatise is comprised of six volumes containing thousands of pages and is universally recognized as the nation's definitive work on search and seizure law. Indeed, it is frequently cited by the United States Supreme Court whenever that Court is dealing with search and seizure cases. Yet, despite the overall comprehensiveness of Professor LaFave's work, its thousands of pages, and his professorship in the State of Illinois, his treatise on search and seizure law contains no mention whatsoever of "motions to quash arrest." We conclude this absence is no oversight.

¶ 62  2. *The "Motion To Quash Arrest" in This Case*

¶ 63  The "motion to quash arrest" in this case failed to serve as a motion to suppress evidence under section 114-12 of the Code. 725 ILCS 5/114-12 (West 2010). Its primary failure was that it never identified the evidence it sought to suppress. Instead, the motion's prayer for relief merely asked the court to find that defendant's "arrest and/or detention was illegal," and therefore his "motion to quash arrest" should be granted, whatever that was supposed to mean.

¶ 64  That this omission was not an oversight is shown by the memorandum defendant filed in support of his "motion to quash arrest." That memorandum similarly concludes with a request that the court grant "the motion to quash the arrest" of defendant. It says nothing about suppressing any evidence, nor does it identify what evidence the trial court should suppress.

¶ 65  Defendant's "motion to quash arrest" in this case is the "poster boy" for all that is wrong with such motions when a defendant is actually seeking to suppress evidence (as we suppose is the case here). After all, the motion (1) does not correctly state its purpose, (2) identifies

no evidence that the trial court should suppress if the court were to find that an unlawful search or seizure occurred, and (3) fails to show wherein the search and seizure of that evidence (whatever it may be) was unlawful.

¶ 66 We earlier pointed out that defendant's "motion to quash arrest," assuming it was really intended to be a motion to suppress evidence, fails to identify the evidence sought to be suppressed. This glaring deficiency is not merely an academic concern. Instead, in this very case, this court is left to wonder exactly what evidence was the object of defendant's motion. In other words, assuming for the moment that defendant's "detention" in the SUV was unlawful as Hair sat with Torbert in Hair's police car writing out the warning ticket, exactly what evidence did the State derive from that unlawful detention that defendant sought to bar from being admitted at trial? Surely that allegedly unlawful detention would not amount to a "get-out-of-jail free card" for defendant when he later pointed his gun at Sergeant Russell and Deputy Dickason and tried to fire it. Nor do we see how any allegedly unlawful detention of defendant in Chenoa could possibly affect the later search by the police of his SUV in Springfield after he fled that vehicle and tried to shoot the police officers. Perhaps if the trial court (even *sua sponte*) or the State had challenged defendant to identify what evidence he was seeking to suppress by filing his "motion to quash arrest," defense counsel's inability to do so might have been apparent even to counsel himself, thus avoiding the waste of everyone's time that resulted from the hearing that the court conducted in this case.

¶ 67 Assuming for the purpose of argument that (1) the object of defendant's motion to quash arrest was the almost-kilogram of cocaine found later in his SUV and (2) his detention in that SUV while the warning ticket was being written was unlawful, then serious questions would still have arisen whether that evidence should have been suppressed at trial. For instance, in *Brown v. Illinois*, 422 U.S. 590, 602-04 (1975), the United States Supreme Court noted that intervening circumstances may be relevant to purging the taint of an illegal arrest. Additionally, the Supreme Court of Illinois recently held that the intervening flight from police can interrupt the causal connection between an unlawful seizure and the subsequent discovery of evidence. *People v. Henderson*, 2013 IL 114040, ¶¶ 44-47, 989 N.E.2d 192. In that case, the supreme court ultimately held as follows:

"We conclude that defendant has failed to demonstrate that the gun was the fruit of the poisonous tree. Defendant's flight interrupted the causal connection between the officers' misconduct, which was not flagrant, and the discovery of the gun. *** To conclude otherwise *** is not only contrary to fourth amendment jurisprudence, but is contrary to public policy. Permitting defendants to flee from police under the circumstances of this case, and yet claim the protections of the fourth amendment, would foster a lack of cooperation with law enforcement officers, putting the police and the public at risk." *Id.* ¶ 50, 989 N.E.2d 192.

¶ 68 Of course, at this point we could simply reject defendant's "motion to quash arrest" for all the reasons previously stated and agree with the trial court's denial of that motion. Nonetheless, despite that motion's manifest deficiencies, we choose to note that, on the merits, we agree with the trial court's conclusion that Hair properly stopped the SUV and no improper detention of defendant occurred. The evidence before the trial court showed that the traffic stop occurred in the early morning hours on a cold winter's night on a rural portion

of I-55. Having the driver of the SUV sit in the police car as the officer wrote him a warning ticket did not amount to an unlawful detention of the passenger who stayed behind in the SUV. The sole case defendant cites in support of his argument otherwise, which is *People v. Sinclair*, 281 Ill. App. 3d 131, 666 N.E.2d 1221 (1996), is entirely inapposite.

¶ 69                    B. Defendant's Contention That Plain Error Was Committed When
                         the Trial Court Permitted a Police Officer To Testify About
                                  What He Saw on a Video Recording

¶ 70    Defendant argues that plain error was committed when the trial court permitted a police officer to testify about what he saw on a video recording. Specifically, Sergeant Russell testified that when defendant exited his own vehicle, Russell saw defendant point the gun at him. However, Russell did not see defendant pull the trigger. Russell also testified that after watching a video of the event, he did see defendant appear to pull the trigger. Defendant cites *People v. Sykes*, 2012 IL App (4th) 111110, 972 N.E.2d 1272, as holding that a court commits error when it permits a witness to testify after having viewed a video regarding what the video recording shows.

¶ 71    When Russell testified as described above regarding what he saw on the video recording, defendant did not object. Accordingly, for this court to reverse his conviction regarding the attempt (first degree murder) count involving Russell, we would have to conclude that the admission of this testimony constituted plain error. Defendant appears aware of the need to raise plain error regarding this testimony because he writes in his brief as follows: "It was plain error to allow this testimony." That sentence constitutes the *entirety* of his plain error "analysis."

¶ 72    Interestingly, *Sykes* also involved application of the plain-error doctrine, but defendant has overlooked or disregarded the plain-error discussion in that case. In *Sykes*, we wrote the following:

        " 'Under the plain-error doctrine, this court will review forfeited challenges when: (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) a clear or obvious error occurred, and the error is so serious that it affected the fairness of the defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence.' *People v. Taylor*, 2011 IL 110067, ¶ 30, 956 N.E.2d 431.

        The defendant has the burden of persuasion under both prongs of the plain-error analysis. *People v. Lewis*, 234 Ill. 2d 32, 43, 912 N.E.2d 1220, 1227 (2009). Prior to determining whether plain error occurred, however, we first determine whether error occurred at all. *Id.* If error did occur, we then consider whether either prong of the plain-error doctrine has been satisfied. *People v. Sargent*, 239 Ill. 2d 166, 189-90, 940 N.E.2d 1045, 1059 (2010)." *Sykes*, 2012 IL App (4th) 111110, ¶ 31, 972 N.E.2d 1272.

¶ 73    What this court wrote in *Sykes* is hardly new or novel. As the Supreme Court of Illinois has reiterated at least 27 times over the past decade, a defendant bears the burden of establishing plain error. Indeed, over the past four years alone, the supreme court has

reminded defendants of this burden 16 times. See *People v. Wilmington*, 2013 IL 112938, ¶ 43, 938 N.E.2d 1025 ("The defendant bears the burden of persuasion under both prongs of the plain-error analysis."); *People v. Leach*, 2012 IL 111534, ¶ 61, 980 N.E.2d 570 (defendant bears burden of establishing plain error); *People v. Adams*, 2012 IL 111168, ¶ 21, 962 N.E.2d 415 (quoting *People v. Herron*, 215 Ill. 2d 167, 187, 830 N.E.2d 467, 480 (2005) (under plain-error analysis, the defendant bears the burden of persuasion under both prongs)); *People v. Kitch*, 239 Ill. 2d 452, 461, 942 N.E.2d 1235, 1241 (2011) ("The defendant bears the burden of establishing plain error."); *People v. Sargent*, 239 Ill. 2d 166, 189-90, 940 N.E.2d 1045, 1059 (2010) (under both prongs of the plain-error analysis, the burden of persuasion rests with the defendant); *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010) ("In plain-error review, the burden of persuasion rests with the defendant."); *People v. Johnson*, 238 Ill. 2d 478, 485, 939 N.E.2d 475, 480 (2010) ("A defendant seeking plain-error review has the burden of persuasion to show the underlying forfeiture should be excused."); *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1188 (2010) ("Defendant has failed to meet his burden of establishing plain error."); *People v. Givens*, 237 Ill. 2d 311, 329 n.2, 934 N.E.2d 470, 481 n.2 (2010) ("In a plain-error case, the defendant has the burden of persuasion before the appellate court on the threshold question of whether plain, obvious error occurred."); *People v. McLaurin*, 235 Ill. 2d 478, 495, 922 N.E.2d 344, 355 (2009) ("In a plain-error review, the burden of persuasion remains on the defendant."); *People v. Lovejoy*, 235 Ill. 2d 97, 148, 919 N.E.2d 843, 871 (2009) (defendant bears the burden of persuasion under a claim of plain error); *In re Samantha V.*, 234 Ill. 2d 359, 368, 917 N.E.2d 487, 494 (2009) ("Under both prongs of the plain-error test, the burden of persuasion remains with respondent."); *People v. Lewis*, 234 Ill. 2d 32, 43, 912 N.E.2d 1220, 1227 (2009) ("The burden of persuasion remains with the defendant under both prongs of the plain-error test."); *People v. Davis*, 233 Ill. 2d 244, 274, 909 N.E.2d 766, 782 (2009) ("Under plain-error review *** the defendant has the burden to persuade the court that the error was prejudicial ***."); *People v. Walker*, 232 Ill. 2d 113, 124, 902 N.E.2d 691, 697 (2009) ("Under both prongs of the plain-error doctrine, the burden of persuasion remains with defendant."); *In re M.W.*, 232 Ill. 2d 408, 431, 905 N.E.2d 757, 773 (2009) ("The defendant has the burden of persuasion on both the threshold question of plain error and the question whether she is entitled to relief as a result of the unpreserved error.").

¶ 74     We decline to provide the analysis that appellant should have provided. " '[A] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.' " *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 474-75, 930 N.E.2d 1024, 1027 (2010) (quoting *Pecora v. Szabo*, 109 Ill. App. 3d 824, 825-26, 441 N.E.2d 360, 361 (1982)). Because defendant's brief is bereft of argument as to why the plain-error doctrine should apply to this case, we deem that contention forfeited.

¶ 75     We could here conclude our discussion of defendant's plain-error contention, such as it is, but we wish to point out three other matters.

¶ 76     First, the lawyer on appeal raising the contention that the trial court committed plain error by permitting Russell to testify as he did is the same lawyer who represented defendant at trial, standing by and saying nothing when this allegedly improper testimony was given. Such

-13-

a situation has probably happened before, but we do not recall any.

¶ 77    Second, not only did defense counsel fail to object to Russell's testimony, he elicited more of it on cross-examination, thus having Russell repeat it. The following is defense counsel's cross-examination of Sergeant Russell pertaining to the issue of his viewing of the video recording:

"Q. And as that gun is pointed at you twenty feet away, as you just stated, officer's safety foremost in your mind, you never saw him pull that trigger, did you?

A. No, I couldn't see that.

Q. And in fact, you have told the ladies and gentlemen of the jury that you only saw that later when you looked at the video; isn't that correct?

A. That is correct.

Q. Yet once you looked at that video, you never made another supplement report saying that you recognized him to pull the trigger, did you?

A. No.

Q. You never made to this date another report laying out–you, as a supervisor who is trained in how to write reports, and you actually train patrolmen that they should write reports, you never made a supplemental report?

A. No. There was no need to because it was captured on video.

Q. And you never stated you saw that and changed your opinion as to whether or not that trigger was pulled, did you?

A. No, because my opinion was based on that night, not the review of the video.

Q. And you never changed with a supplemental–strike that. I will ask you this way.

Anywhere in writing–other than today, have you ever said in writing that you saw the [d]efendant on video or in person pull the trigger in writing?

A. No, there was no need to.

Q. In fact, now that you say you saw the video, when he first points the gun at you tell us how many times you see in that video him pull the trigger.

A. In the video that was played here, I did not see it.

Q. There is another video?

A. No, as it was played today I could not see it.

Q. You saw it back in the station?

A. I saw it at the county building.

Q. At the county building, yes, sir, and you were able to see it then?

A. I was able to see him rack the gun.

Q. Well, with all due deference I'm not asking about racking. You testified a moment ago that you saw in the video him pull the trigger; is that correct?

A. What I saw was him rack the gun and anticipate the recoil on the gun.

Q. So it is fair to say that you have never seen, either in person or in a video,

[defendant] ever pull the trigger?

    A. From my point of view I couldn't see the trigger."

¶ 78    The above cross-examination reveals that defendant actively used the very testimony the admission of which he now contends constituted plain error. Defendant's doing so at the trial level places the evidence at issue under the doctrine of invited error. That is, a defendant may not proceed in one manner and then later contend on appeal that the course of action was in error. *People v. Lucas*, 231 Ill. 2d 169, 174, 897 N.E.2d 778, 781 (2008); see also *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 629, 880 N.E.2d 537, 548 (2007) ("To permit a party to use, as a vehicle for reversal, the exact action which it procured in the trial court would offend all notions of fair play and encourage duplicity by litigants." (Internal quotation marks omitted.)); *People v. Heard*, 396 Ill. 215, 219-20, 71 N.E.2d 321, 323 (1947) ("an accused may not ask the court to proceed in a given manner and then assign as error in a court of review the ruling or action which he procured" (citing cases)).

¶ 79    Third, a consequence of this court's deeming the testimony at issue invited error is that invited errors are not subject to plain-error review. *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 30, 965 N.E.2d 1275; see also *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17, 966 N.E.2d 437 (plain-error review is forfeited when the defendant invites the error; a defendant's invitation *or agreement* to the procedure later challenged on appeal goes beyond mere forfeiture).

¶ 80                 C. Defendant's Claim That the State Failed To Prove Him

                Guilty Beyond a Reasonable Doubt of Attempt (First Degree Murder)

¶ 81    Last, defendant contends that the evidence at trial did not prove him guilty beyond a reasonable doubt of attempt (first degree murder). In making this argument, defendant concedes that he pointed his gun at two police officers but he claims he did not do so with the intent to kill, as is required to prove the offense of attempt (first degree murder). He contends that at trial he explained his conduct by testifying that he just wanted the officers to duck and get out of the way and that he never intended to kill them. We disagree.

¶ 82    As the court explained in *People v. Teague*, 2013 IL App (1st) 110349, ¶ 23, 986 N.E.2d 149, another attempt (first degree murder) case, when a defendant challenges the sufficiency of the evidence, the appellate court's "standard of review is whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The *Teague* court further explained that because intent to kill is a state of mind, it is usually difficult to establish by direct evidence and is typically inferred from the surrounding circumstances. *Id.* ¶ 24, 986 N.E.2d 149. We also note that a reviewing court "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280, 818 N.E.2d 304, 308 (2004). Last, we note that the jury was not required to believe defendant's testimony regarding either why he behaved as he did or what his intent was. *People v. Comage*, 303 Ill. App. 3d 269, 275, 709 N.E.2d 244, 249 (1999).

¶ 83    When the trial court denied defendant's motion for directed verdict at the close of the State's case, the court commented upon the evidence regarding the attempt (first degree

murder) charge concerning Russell, as follows:

"[T]here is circumstantial evidence showing that he did [pull the trigger], from which a reasonable jury could infer that he pulled the trigger with respect to Officer Russell, one, by virtue of [the] fact that the [d]efendant did rack the slide, as indicated in the tape we just viewed, immediately after pointing it at Officer Russell, and typically that would happen, and I believe the evidence is that would happen when somebody wanted to clear the weapon after a misfire, racking the gun because it didn't fire for whatever reason, hoping to fire the gun again shortly thereafter, so there would have been no reason to clear the gun had an attempt to fire it not been mad[e]. [A]t least that's an inference that can be drawn, reasonably, from all the circumstances in the case."

¶ 84    We agree with the trial court that defendant's racking the slide constitutes strong circumstantial evidence that he believed the gun had malfunctioned once he unsuccessfully attempted to discharge it at the police. We also agree with the State's contention that defendant's anticipating the recoil is strong circumstantial evidence that defendant was attempting to discharge the handgun.

¶ 85    We note another similarity of this case with *Teague* in that the defendant in *Teague* argued that no rational trier of fact could have found that he intended to kill the officers because although he fired his rifle from a distance of only 40 feet, his shots hit neither the officers nor their vehicle. The *Teague* defendant claimed that the only possible explanation "for his poor marksmanship [was] that he had no intent to hit the officers, and that he was only trying to keep them at bay while he attempted to escape." *Teague*, 2013 IL App (1st) 110349, ¶ 25, 986 N.E.2d 149. The court in *Teague* rejected this argument, concluding as follows: "Poor marksmanship is not a defense to attempted murder, and it is a question of fact for the jury to determine whether defendant lacked the intent to kill or whether defendant was simply unskilled with his weapon and missed his targets." *Teague*, 2013 IL App (1st) 110349, ¶ 27, 986 N.E.2d 149.

¶ 86    Like the court in *Teague*, we conclude that it was a question of fact for the jury in this case to determine whether defendant was aware that the handgun he pointed at the police officers had the safety on or whether defendant was simply unskilled with his weapon or got confused in the excitement of the police confrontation. The jury resolved these issues against defendant, and we see no reason whatsoever to second-guess its judgment.

¶ 87                                    III. CONCLUSION

¶ 88    For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment as costs of this appeal.

¶ 89    Affirmed.

¶ 90    JUSTICE POPE, specially concurring.

¶ 91    I agree with the majority defendant's conviction should be affirmed. I also agree defendant's "Motion to Quash Arrest" was grossly deficient for failing to request the

suppression of any evidence. However, the entire discussion of motions to quash generally is unnecessary to a resolution of the issues in this case. Thus, I part ways with the majority based upon its sweeping *dicta* regarding motions to quash arrest and suppress evidence because no party has raised or briefed this issue. Our court has not had the benefit of argument on this issue, and consequently I believe we should refrain from wide-ranging generalizations concerning an obviously entrenched practice among the criminal defense bar.

¶ 92   Without addressing the merits of the majority's discussion, I would note a cursory Westlaw search "motion /p quash /p arrest" turns up 2,171 cases. Our supreme court has established a standard of review for denials of motions to quash arrest. See *People v. Redd*, 135 Ill. 2d 252, 268, 553 N.E.2d 316, 322 (1990) ("[a] reviewing court will not disturb a circuit court's ruling on a motion to quash arrest unless that finding is manifestly erroneous"); see also *People v. Gacho*, 122 Ill. 2d 221, 234, 522 N.E.2d 1146, 1152 (1988); *People v. Cabrera*, 116 Ill. 2d 474, 485-86, 508 N.E.2d 708, 712 (1987).

¶ 93   While the majority cites to an absence of a mention of motions to quash arrest by Professor LaFave in his noted treatise, others have recognized the practice as legitimate when combined with a motion to suppress. "Criminal practice does not recognize a Motion to Quash Arrest standing alone; rather, it only recognizes a Motion to Quash Arrest and to Suppress Evidence." Timothy P. O'Neill, *Criminal Defense Lawyers Need Broad Knowledge*, Chicago Daily Law Bulletin, Oct. 8, 2010, at 5.

¶ 94   Last, by titling a motion as a motion to quash arrest and suppress evidence, counsel alerts the trial court to the nature of the issue, *i.e.*, an illegal arrest that may result in the suppression of evidence. Where a court finds an arrest to have been unlawful, there may be benefits that flow to the wronged citizen. Because the issue was not raised, briefed, or argued, we have no idea what those benefits may be; thus, I would limit our discussion to the particular motion filed in this case.