NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220228-U

NO. 4-22-0228

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 21, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| ANZIO KING, | ) | No. 18CF3109 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice DeArmond and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held:* The appellate court affirmed, concluding (1) by stipulating to the State's motion *in limine* regarding the forensic scientist's testimony, defendant waived any argument his sixth amendment confrontation right was violated; (2) defense counsel's stipulation, with defendant's consent, did not constitute ineffective assistance of counsel; and (3) plain error review is not available because defendant invited the error he now challenges.

¶ 2    In June 2020, defendant, Anzio King, was convicted of armed robbery (720 ILCS 5/18-2(a)(1) (West 2018)); home invasion causing injury (*id.* § 19-6(a)(2)); residential burglary (*id.* § 19-3); two counts of criminal sexual assault (*id.* § 11-1.20(a)(1)); aggravated battery while concealing his identity (*id.* § 12-3.05(f)(2)); and unlawful restraint (*id.* § 10-3(a)). The trial court sentenced defendant to an aggregate 80 years' imprisonment. Defendant timely filed a notice of appeal, alleging his sixth amendment right to confrontation was violated when the trial court granted the State's motion *in limine*. In the motion, the State alleged the forensic scientist from the

Illinois State Police crime laboratory (ISP crime lab) who conducted the deoxyribonucleic acid (DNA) testing in defendant's case was unavailable to testify at trial. Accordingly, the State requested a different forensic scientist from the ISP crime lab be allowed to testify regarding the procedures utilized at the lab and her agreement with the conclusions of the unavailable forensic scientist.

¶ 3        We affirm the trial court's judgment, concluding (1) defendant waived any argument that his sixth amendment right to confrontation was violated when the court granted the State's motion *in limine*; (2) defense counsel's stipulation, with defendant's consent, did not constitute ineffective assistance of counsel; and (3) plain error review is not available because defendant invited the error he now challenges.

¶ 4                                I. BACKGROUND

¶ 5        Defendant was charged in Winnebago County with armed robbery (*id.* § 18-2(a)(1)); home invasion while armed with a dangerous weapon (*id.* § 19-6(a)(1)); home invasion causing injury (*id.* § 19-6(a)(2)); residential burglary (*id.* § 19-3); criminal sexual assault by oral penetration (*id.* § 11-1.20(a)(1)); criminal sexual assault by vaginal penetration (*id.* § 11-1.20(a)(1)); criminal sexual assault by anal penetration (*id.* § 11-1.20(a)(1)); aggravated battery with a deadly weapon (*id.* § 12-3.05(f)(1)); aggravated battery while concealing his identity (*id.* § 12-3.05(f)(2)); and unlawful restraint (*id.* § 10-3(a)). Following a bench trial, defendant was convicted of armed robbery, home invasion causing injury, residential burglary, criminal sexual assault by oral penetration, criminal sexual assault by vaginal penetration, aggravated battery while concealing his identity, and unlawful restraint. As defendant was acquitted on the remaining charges, we include only those facts necessary to address the issues raised on appeal.

¶ 6                                A. Pretrial

- 2 -

¶ 7        In January 2020, defendant waived his right to a jury trial and the trial court scheduled a bench trial. Before trial, the State filed a motion *in limine*, requesting the court "admit testimony of [a] non-testing expert." In its motion, the State alleged Dexter McElhiney, the scientist from the ISP crime lab who performed the DNA analysis in defendant's case, was unavailable to testify. The State requested the court allow Laurie Lee, another scientist from the same lab, to testify about the standard procedures utilized by McElhiney in DNA analysis and her opinion of his conclusions. To support its motion, the State cited *People v. Anderson*, 2013 IL App (2d) 111183, 922 N.E.2d 539, and *Williams v. Illinois*, 567 U.S. 50 (2012). Defense counsel, Kunal Kulkarni, objected to the motion, arguing Lee's testimony was inadmissible hearsay. The court granted the motion over Kulkarni's objection.

¶ 8                              B. Bench Trial

¶ 9                              1. *A.N.'s Testimony*

¶ 10       A.N. and her boyfriend moved into an apartment on November 30, 2018. Immediately after moving in, her boyfriend became incarcerated, leaving A.N. alone in the apartment. The apartment building had two units, and A.N.'s unit was upstairs. The first few days, A.N. was friendly with her downstairs neighbors: Smooth (later identified as Mario Craig), Peggy, Jennifer, Rambo (later identified as Randy Bray), Deanna, and Cody. However, A.N. quickly became annoyed with her neighbors because they were constantly "bugging [her]" and asking for "constant rides and stuff." A.N. tried to distance herself, hoping they would leave her alone.

¶ 11       In the early morning of December 3, 2018, A.N. awoke to knocking at her door. A.N. answered the door and saw Jennifer, who requested some food. After A.N. gave Jennifer a half gallon of milk, Jennifer went back downstairs. About an hour later, A.N. heard more knocking. She was reluctant to answer, but the knocking continued. Eventually she heard Jennifer say,

" 'Come on. Let me in. I need to talk to you. I need help.' " When A.N. answered the door, "a man with a white mask and white gloves" pushed Jennifer into the wall and entered A.N.'s apartment. Another man wearing a "blue hoodie" and "black over his face" entered behind him.

¶ 12        The men ransacked A.N.'s apartment and demanded money and guns. A.N. recognized the voice of the man in the blue hoodie as Randy and later identified the man in the white mask as defendant. A.N. denied having guns, and in response, defendant struck A.N. in the face with a blue metal rod and said he "wasn't f*** around." The metal rod cut A.N.'s lip. The men dragged A.N. and Jennifer into the bedroom and defendant pushed A.N. down. The men again requested money. As instructed, A.N. gave her automatic teller machine (ATM) card to Jennifer, but Jennifer returned it to her. Randy ripped the card out of A.N.'s hand and A.N. elbowed and punched Randy, whereafter he ran downstairs with her card. Subsequently, Cody entered A.N.'s apartment, took Jennifer, and went downstairs.

¶ 13        After Cody and Jennifer left, A.N. continued to physically struggle with defendant. A.N. fled downstairs into the building foyer and tried to run outside, but defendant dragged her back inside. Again, A.N. attempted to fight defendant off and screamed for help. Defendant slapped her multiple times and said, " 'I'll slice your throat.' " He then forced her onto the foyer stairs and told her he " 'want[ed] sex.' " Attempting to dissuade him, A.N. insinuated she might have a sexually transmitted disease, but defendant simply tore some plastic off a nearby broken window and "wrapped it on his penis." Defendant then forced A.N. to put his penis in her mouth before telling her to lie on the stairs and remove her pants. He vaginally penetrated her while she told him to stop and " '[d]on't do this.' " During the assault, defendant removed his mask, lifted A.N.'s shirt, and began sucking on her breasts. After removing the mask, defendant said, " 'I'm Anzio.' " A.N. believed defendant ejaculated inside her vagina. Defendant then told her to "get up

and get [her] f*** pants on." A.N. complied and defendant kissed her on the mouth. After the kiss, defendant requested money, so A.N. gave him the $3 she had in her pocket.

¶ 14        A.N. eventually got away from defendant and went into her apartment, where she locked the door and called her brother. She told him that two men had attacked her, and her brother told her to "get out of there." A.N. grabbed her keys and ran outside toward her van, but defendant followed her. Since defendant followed her, A.N. avoided the van and walked toward her brother's house. Defendant continued to follow her, and as the pair walked down the street, the police arrived. The police took defendant into custody and A.N. spoke with the officers. A.N. told Officer Aaron Murphy that defendant beat and raped her. Thereafter, A.N. was transported to the hospital and a rape kit was performed.

¶ 15        On cross-examination, A.N. admitted defendant came to her door on December 2, 2018, and asked for Leslie Peavy, but A.N. told him, " 'I don't know anything about her, and shut the door. (This witness referred to the individual as both Leslie Peavy and Lisa Peavy during her testimony. However, defendant consistently refers to the individual as Leslie. For the sake of clarity, we refer to her as Leslie.) A.N. denied smoking crack with defendant on December 3 or asking defendant to retrieve her ATM card from Randy. A.N. acknowledged that Deanna came upstairs on December 3 and threatened to fight her after A.N. called her brother. However, A.N. denied that a fight occurred with either Deanna or Jennifer and insisted Jennifer was a victim in the attack by Randy and defendant.

¶ 16                    2. *Officers' Testimony*

¶ 17        Officer Aaron Murphy was dispatched around 3 a.m. on December 3 to a possible sexual assault. When he arrived, he spoke with A.N., whose lips were "covered in blood." In addition to her visible injuries, A.N. had no coat and her sweatpants were on backwards. During

the conversation, A.N. began crying and said she was "hit with a broom." A.N. was transported to the hospital, where Murphy continued the interview. She told Murphy that defendant and Randy attacked her. On cross-examination, Murphy agreed that he asked A.N. "if she had been struck by a person named Jennifer or Jenny." Murphy explained he asked that question based on information he received from dispatch. He did not recall whether A.N.'s blouse or sweatpants were torn.

¶ 18　　　　Officer Johnny Vazquez received a dispatch call around 3 a.m. that a woman was sexually assaulted. The caller identified himself as the victim's brother. When Vazquez arrived, he observed two individuals walking in the street. He identified defendant as one of the individuals and noted that he was "listed as the suspect in the initial call for service." When Vazquez illuminated the pair with his spotlight, defendant began walking in the opposite direction. Officers took defendant into custody and patted him down for weapons. Vazquez then spoke to A.N., who was shaking, had blood "coming from her mouth," and had a "thousand-yard stare." After defendant and A.N. were secured in squad cars, Vazquez entered the apartment building and noticed the front door was made of "several small windows." One of the small windows was broken and had plastic taped to it, but the plastic appeared to be freshly torn. Vazquez then went upstairs into A.N.'s apartment and observed it to be in disarray. On cross-examination, Vazquez admitted defendant did not have any weapons or a mask when he was arrested.

¶ 19　　　　Detective Spencer Berke collected evidence and photographed the apartment building. Berke collected a blue metal rod from A.N.'s apartment and two pieces of cellophane from the foyer; he located one piece on the foyer floor and the other attached to a window on the front door. The piece attached to the window appeared to have been "torn away from the area that it was originally covering." On cross-examination, Berke admitted he was unable to locate fingerprints on the blue metal rod or the cellophane. Berke acknowledged he did not locate a mask

but stated he didn't "recall anybody referencing anything about a mask."

¶ 20    Sergeant David Paterson interviewed defendant on December 3 at the police department. Defendant was wearing a black hoodie and a black stocking cap. Officers searched defendant before the interview and found $3 in his pocket. During the interview, defendant voluntarily agreed to provide a DNA sample. On cross-examination, Paterson acknowledged defendant did not have a mask or weapon on him when he was searched.

¶ 21    3. *Nurse Groene's Testimony*

¶ 22    Renee Groene worked as a registered nurse at SwedishAmerican Hospital on December 3, 2018. Around 5 a.m., she treated A.N., who alleged she was sexually assaulted. Groene, along with a physician, performed a sexual assault kit on A.N. As part of the kit, DNA swabs were obtained from A.N.'s vagina and breasts. During the exam, A.N. was "very afraid" and "anxious." On cross-examination, Groene acknowledged there was no "bleeding, tear[ing], or bruising" to A.N.'s vaginal area.

¶ 23    4. *Stipulation*

¶ 24    On the second day of trial, the parties informed the trial court there was a stipulation as to the DNA evidence. Laurie Lee was present and ready to testify. The court directly inquired of defendant whether his attorney discussed the stipulation with him, and defendant indicated he had. Then, the court explained what a stipulation was, in general, and explained, in detail, the proposed stipulation. After those explanations, the court asked defendant if he understood the stipulation. After a discussion between defendant and Kulkarni, defendant said he understood. A written copy of the stipulation, signed by the State, Kulkarni, and defendant was tendered to the court. Defendant acknowledged that no force, threat, or promise was made in exchange for his agreement to the stipulation. The court then inquired whether defendant wanted the court to accept

the stipulation and defendant responded, "Yes, ma'am."

¶ 25    Before accepting the stipulation, the trial court inquired whether the stipulation was "to what Laurie Lee would say or what Dexter would say if called to testify." The State responded, "The stipulation would be to what Dexter would say if called to testify as relayed by Laurie Lee." The following colloquy then occurred:

> "THE COURT: Okay. All right. Then, I think I do have to bring this up. You had objected to Ms. Lee testifying.
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: I, over your objection, allowed her—or am going to allow her to testify. I believe that by entering into the stipulation, you would be waiving that objection that it's her as opposed to Dexter testifying.
>
> [DEFENSE COUNSEL]: That would be correct. We did object to the—for the record. Obviously, we did feel that. But in this case, as the Court over—or overruled our objection and was going to allow her testimony, in that case we— since based on the Court's ruling and the fact that she would testify, we would agree to the stipulation is the way I would phrase it.
>
> THE COURT: Okay. So you're maintaining your objection?
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: But in light of my ruling—
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: —are entering into the stipulation?
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: Okay. Is that your understanding as well, Mr. Getty?

[THE STATE]: Yes, Judge. And, you know, to be clear, too, best practice obviously would be to have Dexter here to testify—

THE COURT: Sure.

[THE STATE]: —as to his findings.

So what the stipulation is essentially doing is allowing both defense and the State to admit the evidence we expected to elicit and testimony we expected to elicit from Dexter in the form of the stipulation.

THE COURT: Okay. I guess I'm not making any prediction whether this is preserving it or not. I mean, you're agreeing to what Dexter would say.

[DEFENSE COUNSEL]: Yes."

¶ 26 After the discussion, the trial court accepted the stipulation, which included a copy of McElhiney's report. The relevant portions of the stipulation read as follows:

"10. Based upon Dexter McElhiney's education, training and experience in DNA and forensic science and as a result of the testing Dexter McElhiney formed the expert opinion to a reasonable degree of scientific certainty that item 1A, the vaginal swabs, that the non-sperm fraction of that sample was not amplified and a DNA contributor was not indicated. Further, the sperm fraction of that sample was not amplified and a DNA contributor was not indicated. See attachment 49A.

11. Based upon Dexter McElhiney's education, training and experience in DNA and forensic science and as a result of the testing, Dexter McElhiney formed the expert opinion to a reasonable degree of scientific certainty that item lB, the oral swab, and the non-sperm fraction of that sample contained 1 female contributor. The sperm fraction was not amplified and a DNA contributor was not

indicated. See Attachment 49A.

12. Based upon Dexter McElhiney's education[,] training and experience in DNA and forensic science and as a result of the testing Dexter McElhiney formed the expert opinion to a reasonable degree of scientific certainty that item 1C, the left breast nipple contained 2 contributors. [Defendant] is included as a DNA contributor with the statistical frequency of 1 in 5.9 Decillion. Further, any other samples of DNA not belonging to [defendant] were excluded as contributors to the sample taken of item 1C. See Attachment 49A."

The stipulation made no reference to Lee or the contents of her testimony if she were called as a witness. Because the stipulation was entered, Lee never testified at trial.

¶ 27                              5. *Motion for a Directed Verdict*

¶ 28          After the trial court accepted the stipulation, the State rested. Kulkarni moved for a directed verdict, arguing the State failed to present sufficient evidence to sustain the charges. In response, the State conceded it had not proven criminal sexual assault by anal penetration but asserted it had proven all other charges. The court granted the motion for a directed verdict on the charge of criminal sexual assault by anal penetration and entered the corresponding verdict of not guilty. The court denied the motion as to all other charges.

¶ 29                              6. *Defendant's Testimony*

¶ 30          On December 1, 2018, while at Mario's apartment, defendant saw A.N. and her boyfriend moving into the upstairs apartment. He and Mario helped them move boxes upstairs. Afterward, defendant introduced himself, saying, " 'My name is Anzio, and I hang out with Mario.' " A.N. responded that she knew who he was because he had a son with Leslie Peavy.

¶ 31          Two days later, defendant was at Mario's apartment drinking with Mario and

Randy. Defendant had cocaine, heroin, and $8 in cash with him. After drinking for around 30 minutes, they ran out of alcohol, so defendant, Cody, and Jennifer walked to the liquor store. Defendant bought four beers for $5 and went back to Mario's apartment. Mario, Randy, and defendant continued drinking, and about 20 minutes later, Jennifer and Deanna left the apartment. When they returned, Jennifer said she was "going to kick the b*** a*** upstairs" because she "got smart with [Jennifer] and cussed her out." Jennifer and Deanna left again, and a few minutes later, Peggy went after them. Peggy immediately returned and told Cody, "Jennifer [is] fighting with the girl upstairs." In response, Cody and Randy left, leaving Mario and defendant in the apartment. A few minutes later, defendant told Mario he was " 'fittin' to go out here and see what they doing.' "

¶ 32          Defendant exited Mario's apartment and ascended the first flight of stairs toward A.N.'s apartment. From the landing, defendant saw Jennifer and A.N. arguing in front of A.N.'s apartment. During the argument, he saw Jennifer punch A.N. "in the mouth," to which A.N. responded, " 'You f*** b***. I'm going to call my brother, and he's going to come over here and kick all of your a***.' " He then saw Randy exit A.N.'s apartment. A.N. entered her apartment, and as Jennifer began walking downstairs, Cody went upstairs and walked into A.N.'s apartment.

¶ 33          Defendant watched Cody grab speakers from A.N.'s apartment and then follow Jennifer downstairs. As Jennifer and Cody walked downstairs, A.N. exited her apartment and yelled, " 'Cody, I know you've got my speakers. Give me my f*** speakers and tell Randy that I know he's got my credit card. He's the only one that's been in here.' " Jennifer and Cody continued downstairs and into Mario's apartment. At that point, defendant and A.N. were the only people in the stairwell. Defendant walked to the bottom of the stairs, sat down, and told A.N. he was "fittin' to get high." He then took a "bump" of heroin and a "hit" from his crack pipe. A.N. came downstairs and stood next to defendant, so he offered her some heroin. She declined, and defendant

handed her his crack pipe. A.N. did two "hits" and returned the pipe. Defendant set the pipe on the banister and began putting away the remainder of his drugs.

¶ 34       Before defendant finished putting the drugs away, A.N. asked what he wanted for the crack. Defendant replied, " 'Well, just give me $7. I got 3. That would be 10. I can go right across the street and I [*sic*] get another bag and I [*sic*] give you some of that too.' " A.N. responded that she did not have any money because Randy stole her card. She then offered to let defendant see her breasts in exchange for the crack, but defendant said, " 'let me suck your breast.' " A.N. pulled out her breasts and defendant "licked on one for like about two or three seconds" then said, " 'You know what, I'll be up here tomorrow. Just give me $5 and we can call it even.' " Defendant denied any other sexual activity with A.N. and insisted A.N. consented to defendant licking her breast.

¶ 35       A.N. took the crack and asked defendant if he would retrieve her card from Randy. Defendant told her he did not want to get involved, but A.N. offered defendant $20 to get it back, so defendant agreed to talk to Randy. Defendant went into Mario's apartment and asked Randy for A.N.'s card. Randy said he did not have it, and Cody yelled, " 'tell [A.N.] we broke it and flushed it down the toilet.' " Defendant accused Randy and Cody of lying and told them A.N. was going to call the police. However, Randy and Cody maintained that they did not have A.N.'s card.

¶ 36       As defendant exited Mario's apartment, he saw Deanna and Jennifer had A.N. pinned against a wall in the foyer. Jennifer was slapping A.N. and saying, " 'B***, why you blaming our boyfriends for having your s***? We ain't got to take s*** from you.' " Defendant yelled to Randy, " 'Man, come get your girlfriend.' " When Randy entered the foyer, Deanna and Jennifer turned around and went into Mario's apartment. Defendant told Randy, " 'That girl is going to call the cops, man. You better give her her stuff.' " Randy denied having A.N.'s card and

returned to Mario's apartment.

¶ 37 Defendant went to find A.N. and saw her outside talking on the phone. When A.N. saw defendant, she started "cussing [him] out, saying [he] sent them out there to attack her, [he's] the one who told them that she was out there." Defendant denied the accusation and told A.N. that Cody broke her card and flushed it. A.N. called defendant a liar and said he was "in on it with them" and she was going to " 'say [he] attacked [her].' " Defendant denied being "in on it" but A.N. kept calling him a liar. While they argued, defendant saw police cars approaching them, so he took some steps backward and threw away the rest of his drugs. The officers arrested defendant and transported him to the station. Defendant was interviewed and voluntarily agreed to a DNA swab. He denied striking A.N., entering her apartment, or sexually assaulting her.

¶ 38 On cross-examination, defendant acknowledged he did not tell detectives he licked A.N.'s breast but insisted that he was never asked about it. Defendant admitted that during the interview, he told detectives, "Hell, yeah, I'm under the influence, both alcohol and drugs."

¶ 39                                    7. *Verdict*

¶ 40 The trial court found defendant guilty of armed robbery; home invasion while armed with a dangerous weapon; home invasion causing injury; residential burglary; criminal sexual assault by oral penetration; criminal sexual assault by vaginal penetration; aggravated battery while concealing his identity; and unlawful restraint. The court found defendant not guilty of aggravated battery with a deadly weapon, opining that a metal pole was not a deadly weapon.

¶ 41                                    C. Posttrial

¶ 42 Kulkarni filed "Defendant's Motion for New Trial/Judgement Not Withstanding Verdict." Defendant later retained new counsel, Glenn Jazwiec. Jazwiec filed an "Amended Motion for Judgment Notwithstanding Verdict or, Alternatively, for a New Trial" in May 2021.

The motion alleged, in pertinent part, as follows:

> "That the Court erred in granting the State's Motion *in Limine* #1 to allow the testimony of Laurie Lee as to the findings and conclusion of forensic scientist Dexter McElhiney who was not able to testify at the time of the trial. That such error was further compounded by the attorney for [defendant] then stipulating to the testimony of Laurie Lee for purposes of the Bench Trial and if such stipulation is found to have waived the objection that was properly made to the State's Motion *in Limine* #1, then such agreement to enter into said stipulation would have represented ineffective assistance of counsel in this matter…"

The State filed a written response, contending the trial court properly granted the State's motion *in limine* and defense counsel waived any claims of error by agreeing to the stipulation. Further, it was not ineffective assistance of counsel to agree to the stipulation. To support its argument, the State asserted as follows:

> "[T]he stipulation was reviewed by the Defendant, signed by the Defendant and his counsel, and addressed on the record. The stipulation involved favorable evidence to the Defendant, consistent with the Defendant's theory of the case; that is, the Defendant's DNA was not a contributor to the samples taken from A.N.'s vagina or mouth. The fact the Defendant's DNA was a contributor from the sample taken from A.N.'s breast was also consistent with the Defendant's theory of the case. The Defendant testified he sucked on A.N.'s breast after she offered it to him in exchange for drugs."

After granting a continuance for each party, the motion was set for hearing in September 2021.

¶ 43 At the hearing, the parties stated there would be no evidence and the trial court

instructed them to begin arguments on the motion. However, any arguments regarding Kulkarni would be set over to another date so Jazwiec could subpoena Kulkarni. Jazwiec argued the court erred in granting the State's motion *in limine*, which "substitute[d] the testimony of Laurie Lee for that of Mr. McElhiney." Furthermore, this error was compounded by Kulkarni's agreement to the stipulation regarding Lee's testimony because it potentially waived defendant's argument on appeal. He contended if Kulkarni's agreement waived defendant's appeal argument, it was ineffective assistance of counsel by Kulkarni.

¶ 44 The State responded when Kulkarni agreed to the stipulation, he waived defendant's appeal argument regarding Lee's testimony. However, Kulkarni was not ineffective because "the [DNA] results could be argued in favor of the defendant as well as the State" and "defendant also wanted to get out that there was nothing located in the vaginal canal of the defendant's DNA with [A.N.]. So there was an incentive that was reasonable for the defense to want to have that come in by stipulation versus having no testimony whatsoever regarding it."

¶ 45 The second day of the hearing, Jazwiec called Kulkarni to testify. Kulkarni acknowledged that he argued against the State's motion *in limine* regarding Lee's testimony. However, Kulkarni contended he agreed to the stipulation for two reasons. First, defendant was eager to proceed with trial and did not want any additional delay due to McElhiney's unavailability. Second, the stipulation was favorable to defendant's theory of events. Kulkarni asserted he "did not believe *** waiving the issue *** hurt [their] trial strategy in any shape or form." Further, Kulkarni noted he only agreed to the stipulation "after a full discussion with [defendant] about the implications of the testimony, what the testimony meant, and how it fitted [*sic*] into [their] trial strategy."

¶ 46 After Kulkarni's testimony, Jazwiec again argued Kulkarni was ineffective by

- 15 -

agreeing to the stipulation and thus waiving defendant's argument for appeal. Jazwiec contended "there was [no] basis or trial strategy *** to stipulate to the Court regarding these findings after the Court granted a motion that [Kulkarni] argued against." The State maintained its position that the stipulation contained favorable information for defendant, and thus, it was "a rational decision and reasonable under professional norms" for Kulkarni to agree to the stipulation.

¶ 47    In its decision, the trial court began by opining that the State failed to prove defendant was armed with a dangerous weapon when he entered A.N.'s apartment. Consequently, the court changed its verdict on the charge of home invasion while armed with a dangerous weapon to not guilty. It then found that defendant's appeal argument regarding Lee's testimony was "waived when the defendant testified" and the stipulation was consistent with defendant's testimony. Therefore, defendant failed to prove Kulkarni was ineffective for agreeing to the stipulation.

¶ 48    At defendant's sentencing hearing, the trial court sentenced defendant to an aggregate 80 years' imprisonment.

¶ 49    Jazwiec filed a "Motion to Reconsider Sentence," which was denied after a hearing. Defendant timely filed a notice of appeal.

¶ 50    This appeal followed.

¶ 51                                II. ANALYSIS

¶ 52    Defendant argues his sixth amendment right to confrontation was violated when the trial court granted the State's motion *in limine*, which would have allowed Lee to provide "surrogate testimony" regarding McElhiney's forensic testing and conclusions. In response, the State contends defendant waived his sixth amendment right, and consequently, his right to raise this issue on appeal, when defense counsel agreed to the stipulation on McElhiney's testimony and

- 16 -

report. Alternatively, the State asserts if we find defendant has not waived his appeal right on this issue, any error by the court was harmless beyond a reasonable doubt. Defendant counters that if we determine he waived his appeal right, it was ineffective assistance for Kulkarni to agree to the stipulation. We begin by determining whether defendant waived his sixth amendment right to confrontation.

¶ 53                    A. Waiver of Sixth Amendment Right to Confrontation

¶ 54        The sixth amendment provides, "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. This portion of the sixth amendment, designated the "confrontation clause," applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). *People v. Barner*, 2015 IL 116949, ¶ 40, 30 N.E.3d 271. The United States Supreme Court held, in *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004), that the confrontation clause prohibits the use of out-of-court statements made by witnesses which are "testimonial," unless the witness is unavailable and the defendant had prior opportunity to cross-examine the witness.

¶ 55        Although a defendant's sixth amendment right is absolute, the Illinois Supreme Court has determined "counsel in a criminal case may waive his client's sixth amendment right of confrontation by stipulating to the admission of evidence as long as the defendant does not object to or dissent from his attorney's decision, and where the decision to stipulate is a matter of legitimate trial tactics or prudent trial strategy." *People v. Campbell*, 208 Ill. 2d 203, 220-21, 802 N.E.2d 1205, 1215 (2003).

¶ 56                            1. *Objection by Defendant*

¶ 57        In this case, it is clear from the record that defendant did not object to the stipulation regarding McElhiney. In fact, defendant affirmatively agreed to the stipulation after an extended

colloquy with the trial court about the stipulation and what it meant. The court also inquired of Kulkarni whether the stipulation was accurate and if it was discussed with defendant. Lastly, defendant acknowledged there were no threats or promises made to induce his agreement to the stipulation.

> "THE COURT: For—well, has anyone forced you or threatened you to get you to sign the stipulation?

> THE DEFENDANT: No.

> THE COURT: Has anyone promised you anything?

> THE DEFENDANT: No.

> THE COURT: All right. So you're just doing it, really it's a matter of making things go smoother—

> THE DEFENDANT: Yes, ma'am.

> THE COURT: —shortening up the testimony, and then we'll move on with you making a decision regarding whether or not your wish to present any evidence in your case.

> DEFENDANT: Yes, ma'am.

> THE COURT: Okay. And do you wish me to accept the stipulation?

> THE DEFENDANT: Yes, ma'am."

The State then presented the written stipulation, which was signed by the State, Kulkarni, and defendant, to the court. Defendant had ample opportunity to object to the stipulation and chose not to do so, even after being advised as to the stipulation and its implications.

¶ 58                                    2. *Trial Strategy*

¶ 59          Because defendant did not object to the stipulation, the question is whether

Kulkarni's agreement to the stipulation was "legitimate trial tactics or prudent trial strategy." *Id.* Defendant's theory of the case was that he consensually licked A.N.'s breast in exchange for drugs. Moreover, while he admitted consensually licking her breast, he adamantly denied assaulting A.N. or having additional sexual contact with her. He also testified A.N. threatened to "say [defendant] attacked [her]." The stipulation fits within defendant's version of events. The stipulation stated defendant's DNA was located solely on A.N.'s left nipple and not in her vagina or mouth. Kulkarni utilized the stipulation to discredit A.N.'s version of events due to the lack of DNA in her mouth or vagina. Furthermore, as conceded by defendant, the stipulation did not prove any element of any charged offense, as defendant was not charged with criminal sexual assault by placing his mouth on A.N.'s breast. Kulkarni's testimony at the posttrial motion hearing further supports the argument that the decision to agree to the stipulation was "prudent trial strategy." *Id.* Kulkarni specifically stated that he did not agree to the stipulation until he fully discussed it with his client and discussed how the stipulation "fitted [*sic*] into [their] trial strategy."

¶ 60       The facts in this case are analogous to *Campbell*. In *Campbell*, defense counsel objected to the State's request for a continuance due to the unavailability of a witness. *Id.* at 206. The trial court granted the request over defense counsel's objection but continued the trial to the next day. *Id.* That next day, the State and defense counsel presented a stipulation regarding the unavailable witness's testimony. *Id.* at 208. Following trial, the defendant was convicted, and he appealed, asserting his sixth amendment right to confrontation was violated by the stipulated testimony. *Id.* at 208-09. Our supreme court determined the defendant's sixth amendment right was waived when his counsel agreed to stipulate to the unavailable witness's testimony. *Id.* at 217. Further, the court found it was legitimate trial strategy for defense counsel to do so, stating "[d]efense counsel used the stipulation to establish defendant's lack of any criminal intent," and

- 19 -

"the stipulation also allowed defense counsel to present evidence that there was a reasonable and legitimate explanation for defendant's entry into the premises." *Id*. at 220. In this case, Kulkarni utilized the DNA evidence, admitted through the stipulation, to discredit A.N.'s version of events and bolster defendant's version of events.

¶ 61        Here, defendant did not object to the stipulation, and the stipulation was "legitimate trial tactics or prudent trial strategy." *Id*. at 221. Accordingly, defendant, through his counsel, waived his sixth amendment right to confrontation by agreeing to the stipulation which encompassed McElhiney's forensic testing and conclusions.

¶ 62                                B. Invited Error Doctrine

¶ 63        Having concluded Kulkarni's agreement to stipulate to the DNA evidence waived defendant's sixth amendment right to confrontation, we must now determine whether that decision also waived defendant's ability to appeal any error by the trial court in granting the State's motion *in limine*, pursuant to the invited error doctrine.

¶ 64        Under the invited error doctrine, "a party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217, 821 N.E.2d 283, 287 (2004). Furthermore, the Illinois Supreme Court has determined even when evidence is improper, a defendant who "procures, invites, or acquiesces in the admission of [the] evidence *** cannot contest the admission on appeal." *People v. Bush*, 214 Ill. 2d 318, 332, 827 N.E.2d 455, 463 (2005). "The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *Swope*, 213 Ill. 2d at 217.

¶ 65        In this case, defendant, through his counsel, agreed to a stipulation regarding McElhiney and his report. Before accepting the stipulation, the trial court had the following

colloquy with Kulkarni:

> "THE COURT: Okay. All right. Then, I think I do have to bring this up. You had objected to Ms. Lee testifying.
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: I, over your objection, allowed her—or am going to allow her to testify. *I believe that by entering into the stipulation, you would be waiving that objection that it's her as opposed to Dexter testifying.*
>
> [DEFENSE COUNSEL]: *That would be correct.* We did object to the—for the record. Obviously, we did feel that. But in this case, as the Court over—or overruled our objection and was going to allow her testimony, in that case we—since based on the Court's ruling and the fact that she would testify, we would agree to the stipulation is the way I would phrase it.
>
> THE COURT: Okay. *So you're maintaining your objection?*
>
> [DEFENSE COUNSEL]: *Yes.*
>
> THE COURT: But in light of my ruling—
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: —are entering into the stipulation?
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: Okay. Is that your understanding as well, Mr. Getty?
>
> [THE STATE]: Yes, Judge. And, you know, to be clear, too, best practice obviously would be to have Dexter here to testify—
>
> THE COURT: Sure.
>
> [THE STATE]: —as to his findings.

- 21 -

So what the stipulation is essentially doing is allowing both defense and the State to admit the evidence we expected to elicit and testimony we expected to elicit from Dexter in the form of the stipulation.

THE COURT: Okay. I guess *I'm not making any prediction whether this is preserving it or not. I mean, you're agreeing to what Dexter would say.*

[DEFENSE COUNSEL]: *Yes.*" (Emphases added.)

Kulkarni chose to enter the stipulation, even after the court advised that the stipulation may waive any appeal issue regarding Lee's testimony. (We again note that while the parties and the court discuss the stipulation being to Lee's testimony, there is no mention of Lee in the stipulation. It appears to be a stipulation to McElhiney's testimony and report.) While Kulkarni affirmatively stated he was maintaining his objection (to the court's prior ruling on the State's motion *in limine*), the objection had been only to Lee's surrogate testimony due to McElhiney's unavailability, not McElhiney's report. Furthermore, the court specifically advised that it was "not making any prediction whether this is preserving it or not." This acquiescence to the stipulation by Kulkarni and defendant invokes the invited error doctrine. Defendant now contests the admission of the DNA evidence that he and his counsel stipulated to at trial, which is precisely the type of error the invited error doctrine prohibits.

¶ 66        We are not persuaded by defendant's argument this issue was preserved for appeal through Kulkarni's objection prior to trial and Jazwiec's posttrial motion on the issue. First, as has been mentioned, the objection to the State's motion *in limine* was based upon an objection to Lee's surrogate testimony and the stipulation appeared to only relate to McElhiney. Second, even if the stipulation included Lee's surrogate testimony, as suggested by the parties and court, any argument the court erroneously granted the State's motion *in limine* was waived through the invited error

doctrine when Kulkarni agreed to the stipulation during trial. Defendant relies on *People v. Wright*, 2012 IL App (1st) 073106, 971 N.E.2d 549, for the position that if a defendant objects prior to trial and again in a posttrial motion, the issue is preserved for appellate review. However, *Wright* is factually distinguishable from this case. The issue in *Wright* was not whether there was invited error, but rather, whether the issue had been forfeited on appeal based on the defendant's failure to obtain a ruling on his DNA motion and subsequently file a posttrial motion. *Id.* ¶¶ 68-74. See *People v. Schwandt*, 2022 IL App (4th) 200583, ¶ 20 (determining the appellate court need not address an invited error argument when a defendant forfeited his argument for appeal). Defendant concedes this distinction when discussing *Wright*, stating, "[n]o issue of waiver was raised or addressed, but the court did find that defendant had not forfeited the issue for review because he raised the issue in a pretrial motion *in limine* and again in a posttrial motion." In this case, it is true that Kulkarni objected to the State's motion *in limine* and Jazwiec filed a posttrial motion on the issue. However, during the trial, Kulkarni and defendant agreed to the stipulation regarding McElhiney's analysis and conclusions. This stipulation waived defendant's right to raise any error with respect to DNA evidence.

¶ 67          We note although the State failed to mention invited error in its argument, it argued defendant waived the issue. This court finds the error was invited.

¶ 68                          C. Ineffective Assistance of Counsel

¶ 69          Defendant contends if we determine he has waived his right to appeal this issue, that Kulkarni provided ineffective assistance of counsel by agreeing to the stipulation. He argues a reasonable attorney would not have (1) agreed to the stipulation, thus failing to preserve his claim for appellate review or (2) agreed to stipulate to "highly prejudicial testimony" that violated defendant's sixth amendment right to confrontation. Defendant asserts he was prejudiced by the

stipulation because the DNA was "the only piece of physical evidence that supported that any sexual contact occurred between A.N. and [defendant]." (Emphasis omitted.)

¶ 70　　　　　A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail on a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14, 67 N.E.3d 233 (quoting *Strickland*, 466 U.S. at 688). Prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004). A defendant must satisfy both prongs of the *Strickland* standard, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18, 939 N.E.2d 310, 319 (2010).

¶ 71　　　　　For the same reasons we find it was reasonable trial strategy for Kulkarni to agree to the stipulation, we find that Kulkarni's performance did not constitute ineffective assistance of counsel. "Allegations arising from matters of judgment or trial strategy will not support a claim of ineffective assistance of counsel." *People v. Beard*, 356 Ill. App. 3d 236, 244, 825 N.E.2d 353, 361 (2005). Further, "[t]rial strategies themselves are unsound only when no reasonably effective criminal defense attorney, facing similar circumstances, would pursue them." *Id*. In this case, the stipulation contained evidence which specifically fit within defendant's version of events and was utilized to discredit A.N.'s version of events. It is clear from the record Kulkarni's decision to stipulate to the DNA evidence was a matter of reasonable trial strategy. Thus, defendant's claims

fail to satisfy the first prong of the *Strickland* test.

¶ 72                                    D. Plain Error

¶ 73         Lastly, defendant argues in his reply brief that this court should review the violation of his sixth amendment right under the plain error doctrine. However, it is well-settled that "invited errors are not subject to plain-error review." *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 79, 996 N.E.2d 1227. Because we have determined defendant waived his appeal argument as to his sixth amendment confrontation right through the invited error doctrine, we decline to conduct a plain error analysis.

¶ 74                                    III. CONCLUSION

¶ 75         For the reasons stated, we affirm the judgment of the trial court.

¶ 76         Affirmed.