NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250326-U

NO. 4-25-0326

IN THE APPELLATE COURT

FILED
May 26, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| BRADLEY SCOTT YOHN, | ) | No. 21CF715 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Thomson, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Zenoff and Vancil concurred in the judgment.

**ORDER**

¶ 1  *Held*: (1) The trial court did not abuse its discretion in finding the deceased victim's out-of-court statements were admissible at defendant's jury trial under the excited utterance exception to the hearsay rule.
(2) The trial court did not err in finding the statements were nontestimonial and therefore did not implicate defendant's right to confrontation.

¶ 2  A jury found defendant, Bradley Scott Yohn, guilty of home invasion (720 ILCS 5/19-6(a)(1) (West 2020)), aggravated kidnapping (*id.* § 10-2(a)(5)), aggravated vehicular hijacking (*id.* § 18-4(a)(1)), and aggravated criminal sexual assault (*id.* § 11-1.30(a)(1)), and he was sentenced to 130 years in prison. Defendant appeals his convictions, arguing on appeal that the trial court "erred in allowing the State to admit out-of-court, testimonial statements the deceased complainant made to her husband and a sheriff's deputy for the truth of the matter asserted where no hearsay exception existed, in violation of the hearsay rule and [the] right to confrontation." We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Charges

¶ 5        In November 2021, defendant was indicted on two counts of home invasion

(counts I and II) (*id.* § 19-6(a)(1), (6)) and one count each of aggravated kidnapping (count III)

(*id.* § 10-2(a)(5)), aggravated vehicular hijacking (count IV) (*id.* § 18-4(a)(1)), aggravated

criminal sexual assault (count V) (*id.* § 11-1.30(a)(1)), and residential burglary (count VI)

(*id.* § 19-3(a)). The indictments were based on allegations that defendant approached the alleged

victim, C.L.—who was 60 years of age or older—in her parked car under the pretext of offering

assistance, then commandeered the vehicle and drove it to C.L.'s residence, where he proceeded

to sexually assault her, burglarize the home, and flee the area in her vehicle. C.L. died before

defendant's trial, but the State indicated at a pretrial hearing that it was "not going to present any

evidence or somehow allege that [defendant] caused that death."

¶ 6                                    B. Pretrial Proceedings

¶ 7        Prior to trial, the trial court granted defendant's request to proceed *pro se* and

allowed his previously appointed counsel to serve as standby counsel at his trial. Defendant filed

numerous pretrial motions *pro se*. In relevant part, he filed (1) a motion to dismiss the charges

pursuant to section 114-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-1

(West 2022)) and (2) a "Motion to Suppress/Exclude Statement/Testimony."

¶ 8                                    1. *Motion to Dismiss the Charges*

¶ 9        In his motion to dismiss the charges, defendant argued the State was prohibited

from introducing out-of-court statements C.L. had made around the time of the alleged offenses

because they were hearsay and did not fall under the excited utterance exception to the hearsay

rule or any other exception to the rule. He further argued that the statements were testimonial and

therefore inadmissible under the confrontation clause of the sixth amendment to the United States Constitution (U.S. Const., amend. VI) because he never had an opportunity to cross-examine C.L. before her death. The trial court denied defendant's motion following a hearing.

¶ 10          2. *Motion to Suppress/Exclude Statement/Testimony*

¶ 11          In his other relevant pretrial motion, defendant argued that statements C.L. made to her husband, Timothy Schmitt, were inadmissible as hearsay that did not fall within any exception to the rule and because C.L. was not available to testify. The trial court denied defendant's motion following a hearing.

¶ 12          C. Jury Trial

¶ 13          Defendant's jury trial commenced on July 10, 2023, and concluded on July 17, 2023. We discuss only the evidence presented that is relevant to the issues raised on appeal.

¶ 14          1. *The State's Evidence*

¶ 15          a. Schmitt

¶ 16          Schmitt testified that at the time of the alleged offenses, he had been in a relationship with C.L. for 36 years and married to her for 2 years. On the date in question, Schmitt left work around 5 p.m. and returned home approximately one hour later. As he pulled into the driveway, he noticed that the garage door was open, C.L.'s car was gone, and there were tire tracks in the yard, all of which were concerning to him. He then noticed that the door leading into the house from the garage had been kicked in. Schmitt walked through the broken doorway and "saw [C.L.] sitting on the floor in tears." Schmitt testified, "She was crying and she told me that they raped her." Defendant objected, arguing C.L.'s statements were testimonial; the trial court overruled the objection. Schmitt further testified that C.L. was sitting on the floor on a

- 3 -

blanket with blood on it, which he indicated had come from "her genital region." He also noticed a knife on the floor nearby. Schmitt described C.L. as being in an emotional state and sobbing. He testified that C.L. told him she was worried the assailants would return, so he got a gun from the bedroom, gave it to her, and then called the police.

¶ 17    The prosecutor asked Schmitt if, after calling the police, he questioned C.L. about what had occurred. Schmitt testified that he had questioned her, and he then recounted C.L.'s statements to him:

> "She told me that she was driving home *** and the lights were not on in the car, and she stopped there at the stop sign, and *** a man came and *** went to help her to turn the lights on, and he got in the car with her and he drove off with her."

Schmitt continued by testifying C.L. told him that while they were in the car, "the man" made her take off her shirt and touched her breasts and he forced her to perform oral sex on him. C.L. told Schmitt that "she thought [they] were going to kill her"—Schmitt later testified that C.L. told him there was also a woman with the man—so "she told them that she had some jewelry up at the house and some money." The man told C.L. that if her husband was home, he would kill them both. When they arrived at the house, the man and the woman got into an argument, and C.L. managed to run inside and lock the door behind her. The man kicked in the door, and C.L. told him where her jewelry was located. C.L. told Schmitt that the man then threw her down the basement stairs, at which point she told the man that there was a safe in the basement. As he was trying to open the safe, C.L. told him that "the safe was wired to the police and the police were coming." C.L. told Schmitt that the man then took her back upstairs and "raped her." C.L. further stated to Schmitt that the female "had threatened to kill her with that knife."

¶ 18　　During his cross-examination of Schmitt, defendant questioned him about the statements C.L. had made to him at the scene of the crime.

¶ 19　　　　　　b. Officer Joe Lohmeyer

¶ 20　　Joe Lohmeyer testified that he was a patrol sergeant with the Adams County Sheriff's Office, and on the date in question, a "call came in as a woman—carjacking and rape." Officer Lohmeyer testified that he and another officer were the first to respond to the call, arriving at the scene at approximately 6:30 p.m. Upon entering the residence, Officer Lohmeyer observed "an older female sitting on the floor with her legs kind of off to the side. She appeared distraught." Officer Lohmeyer testified that because the "suspects were not on scene," his main concern at the time was "community safety" and figuring out "[w]here this guy is at and try[ing] to stop any future problems." Officer Lohmeyer testified that for this reason, he asked C.L. to explain what had happened and to provide a description of the assailants. When the prosecutor asked Officer Lohmeyer to recount what C.L. told him, defendant objected, arguing C.L.'s statements were "testimonial hearsay." The trial court overruled defendant's objection.

¶ 21　　Officer Lohmeyer recounted what C.L. told him had happened, and her statements to him were nearly identical to her statements to Schmitt, described above. Further, Officer Lohmeyer testified that he asked C.L. if she could provide a description of the assailants, and she described them as "a white, scruffy, red-headed male" and a "shorter black female." He also testified to his observations of C.L.'s demeanor as she was providing her statements to him:

> "So when I saw her, she was on the floor. There was some crying, but it was also—I think what I see in other people is shock, just disbelief, kind of bewilderment. You know, when I would talk to her and ask her what happened, there was like a pain for kind of remembering it, you know, and some hesitation,

and it was kind of a little bit disjointed as far as how the conversation went. And I think that was a reflection of how emotional she was. You know, she seemed— You know, I had described it as shock, but, you know, it was—the best I can describe that, just utter confusion I think and disbelief is kind of what I read in her face and pain I think of having to remember what happened."

¶ 22 During his cross-examination of Officer Lohmeyer, defendant questioned him about the statements C.L. had made to him at the scene of the crime.

¶ 23                                    2. *Defendant's Evidence*

¶ 24 Defendant called several witnesses to testify during his case-in-chief. In relevant part, he questioned certain of his witnesses about C.L.'s statements that he is now challenging on appeal.

¶ 25                                    3. *Jury Verdict*

¶ 26 The jury ultimately found the State had proven defendant guilty of each count beyond a reasonable doubt.

¶ 27                              D. Posttrial Proceedings

¶ 28 Following the guilty verdict, the trial court granted defendant's request for the appointment of posttrial counsel, who subsequently filed a motion for a new trial on his behalf.

¶ 29 On September 25, 2023, after hearing and denying defendant's motion for a new trial, the trial court conducted a sentencing hearing. At the sentencing hearing, the State informed the court that it was moving to dismiss count II to avoid any potential one-act, one-crime violation and that count VI should merge into count I. The court accepted the State's dismissal of count II and agreed that count VI would merge into count I. Ultimately, the court sentenced defendant to 30 years in prison on counts I, III, and IV and 40 years in prison on count V, with

all of the sentences to be served consecutively, for a total of 130 years in prison.

¶ 30    Defendant filed a timely motion to reconsider his sentence, which the trial court heard in December 2023. The court noted at the hearing that it had received a *pro se* letter from defendant alleging a claim of ineffective assistance of posttrial counsel. The court found possible merit to defendant's claim and, without ruling on the motion to reconsider sentence, appointed him new posttrial counsel to investigate the claim further.

¶ 31    In August 2024, defendant filed a motion alleging ineffective assistance of posttrial counsel and requesting that the trial court grant him leave to file an amended motion for a new trial. The court granted defendant's request for leave, and he thereafter filed an amended motion for a new trial. In the motion, he argued, in relevant part, that the court had erred in denying his pretrial motions to suppress C.L.'s statements and by allowing the State to "use hearsay" and "evade *Crawford* [*v. Washington*, 541 U.S. 36, 51 (2004)]" at his trial. In January 2025, the court conducted a hearing on defendant's motion and took the matter under advisement. The court also granted defendant leave to file an amended motion to reconsider his sentence.

¶ 32    On March 5, 2025, the trial court entered a written order denying defendant's amended motion for a new trial and, following a hearing on March 28, 2025, the court denied defendant's amended motion to reconsider his sentence.

¶ 33    This appeal followed.

¶ 34    II. ANALYSIS

¶ 35    On appeal, defendant argues the trial court erred in admitting C.L.'s out-of-court statements to Schmitt and Officer Lohmeyer because they were (1) hearsay that did not fall within the excited utterance exception and (2) testimonial in nature and therefore inadmissible

under the confrontation clause where he did not have an opportunity to cross-examine her.

¶ 36                                    A. Invited Error

¶ 37        Before reaching the merits of defendant's claims, we must first address the State's

argument that defendant invited the error of which he now complains on appeal through his

questioning of certain witnesses on cross-examination and in his case-in-chief. According to the

State, "the statements from C.L. and others that defendant elicited via his questioning, taken with

the other evidence introduced at trial, clearly established all of the facts he now complains of." In

support, the State relies on this court's decision in *People v. Ramirez*, 2013 IL App (4th) 121153.

¶ 38        "The doctrine of invited error prevents a defendant from raising a claim on appeal

where he or she 'procures, invites, or acquiesces in the admission' of otherwise improperly

admitted evidence." *People v. Collins*, 2020 IL App (1st) 181746, ¶ 16 (quoting *People v. Bush*,

214 Ill. 2d 318, 332 (2005)). "This is because, by acquiescing in rather than objecting to the

admission of allegedly improper evidence, a defendant deprives the State of the opportunity to

cure the alleged defect." *Bush*, 214 Ill. 2d at 332; see *People v. Trefonas*, 9 Ill. 2d 92, 98 (1956)

("A party cannot sit by and permit evidence to be introduced without objection and upon appeal

urge an objection which might have been obviated if made at the trial."); *People v. Segoviano*,

189 Ill. 2d 228, 241 (2000) ("[I]t is well established that an accused may not ask the trial court to

proceed in a certain manner and then contend in a court of review that the order which he

obtained was in error." (Internal quotation marks omitted.)).

¶ 39        Here, it cannot be fairly stated that defendant procured, invited, or acquiesced in

the admission of C.L.'s statements to Schmitt and Officer Lohmeyer. See *Bush*, 214 Ill. 2d at

332. The State's reliance on *Ramirez* is misplaced. In that case, we found the invited-error

doctrine applied because the defendant had acquiesced in the admission of the complained-of

testimony at trial by "fail[ing] to object to [it and then] elicit[ing] more of it on cross-examination." *Ramirez*, 2013 IL App (4th) 121153, ¶ 77. That is not what happened in this case. Rather, in this case, defendant objected to the admission of C.L.'s statements not only at trial, but also before trial. Thus, *Ramirez* is readily distinguishable.

¶ 40     We agree with defendant that his actions in the trial court in this case were more akin to those of the defendant in *Collins*. There, the State argued on appeal that the defendant had "invited or acquiesced to the admission of [a police officer's] body camera video because he later used the error by incorporating the video into his arguments about the unreliability of [the officer's] testimony." (Internal quotation marks omitted.) *Collins*, 2020 IL App (1st) 181746, ¶ 16. The *Collins* court rejected the State's argument, finding that because the defendant had objected to the video's admission before and during trial, he had not invited or acquiesced in its admission. *Id.* ¶ 17. Instead, the *Collins* court concluded the defendant had only incorporated the video into his argument "to make the best of the jury viewing [it] over h[is] objection." *Id.* ¶ 18.

¶ 41     We find the same thing occurred in this case. After defendant's repeated objections to the admission of C.L.'s statements had been overruled and the statements were admitted into evidence, defendant attempted "to make the best" of the jury having heard them by testing their reliability during cross-examination and in his case-in-chief. *Id.* Thus, we reject the State's invited-error argument and will address defendant's claims on the merits.

¶ 42                         B. Excited Utterances

¶ 43     Turning to the merits, defendant first argues that the trial court erred in finding C.L.'s statements to Schmitt and Officer Lohmeyer fell within the excited utterance exception to the hearsay rule.

¶ 44                                                    1. *The Law*

¶ 45            " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). "Hearsay is not admissible except as provided by [the Illinois Rules of Evidence], by other rules prescribed by the Supreme Court, or by statute." Ill. R. Evid. 802 (eff. Jan. 1, 2011). Rule of Evidence 803(2) provides an exception for excited utterances, also known as spontaneous declarations. Ill. R. Evid. 803(2) (eff. Jan. 25, 2023); see *People v. Sutton*, 233 Ill. 2d 89, 107 (2009). An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). "The theory underlying the exception is that the event is so startling that it temporarily stills the capacity for reflection, thus producing statements free of conscious fabrication." (Internal quotation marks omitted.) *People v. Hunter*, 2023 IL App (4th) 210595, ¶ 62.

¶ 46            To be admissible under the excited utterance exception, a hearsay statement must meet three requirements: "(1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must be an absence of time for the declarant to fabricate the statement, and (3) the statement must relate to the circumstances of the occurrence." *People v. Williams*, 193 Ill. 2d 306, 352 (2000). "Courts employ a totality of the circumstances analysis in determining whether a hearsay statement is admissible under the spontaneous declaration exception." *Sutton*, 233 Ill. 2d at 107. "The totality of the circumstances analysis involves consideration of several factors, including time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest." *Id.* "The time factor has been described as an 'elusive' factor, 'whose significance will vary with the facts of

each case.' " *Williams*, 193 Ill. 2d at 353 (quoting *People v. House*, 141 Ill. 2d 323,382 (1990)). "Indeed, the period of time that may pass without affecting the admissibility of a statement under the spontaneous declaration exception varies greatly." *Id.* "The critical inquiry with regard to time is whether the statement was made while the excitement of the event predominated." (Internal quotation marks omitted.) *Sutton*, 233 Ill. 2d at 107.

¶ 47        "A trial court's evidentiary rulings on hearsay testimony and any applicable exceptions are reviewed under an abuse-of-discretion standard." *People v. Burney*, 2011 IL App (4th) 100343, ¶ 40. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 48                                    2. *This Case*

¶ 49        We note defendant does not dispute that C.L.'s statements to Schmitt and Officer Lohmeyer met the first and third requirements of the excited utterance exception—*i.e.*, he does not dispute that the occurrence was sufficiently startling or that the statements related to the circumstances of the startling event. Instead, he challenges only the second requirement, arguing that C.L. had sufficient time to fabricate her statements to Schmitt and Officer Lohmeyer.

¶ 50                          a. C.L.'s Statements to Officer Lohmeyer

¶ 51        In support of his argument that C.L.'s statements to Officer Lohmeyer were not excited utterances, defendant points to the following three factors: (1) Officer Lohmeyer was not the first person she saw or spoke to after the occurrence, (2) the statements were made in response to his questioning, and (3) C.L. "had approximately 16 minutes to speak with Schmitt before she would have been able to speak to [Officer] Lohmeyer, giving her time to reflect upon what had occurred."

¶ 52        Initially, we note that in support of the first two factors identified by defendant, he has cited several cases from the Second District for the following legal propositions: (1) "a statement [is] spontaneous when the occurrence happened within the past few minutes and the statement was made to the first person the declarant encountered, rather than in response to questioning," and (2) "[a]n intervening discussion between an occurrence and a statement a party seeks to admit as an excited utterance destroys the spontaneity of the statement and might cause the declarant to reflect on the statement, moving it outside the realm of the excited utterance exception." *People v. Busch*, 2020 IL App (2d) 180229, ¶ 41; see *People v. Victors*, 353 Ill. App. 3d 801, 810 (2004); see also *People v. Sommerville*, 193 Ill. App. 3d 161, 175 (1990).

¶ 53        We are unpersuaded by defendant's cited cases, as they appear to conflict with the precedent of both our supreme court and this court. Although our supreme court has noted that "the fact that a declarant's statement is made at the first opportunity to speak supports a finding of spontaneity," it has also made clear that "a declarant may make a spontaneous declaration to a person even after having spoken previously to another." *Williams*, 193 Ill. 2d at 352-53. Indeed, the supreme court has explicitly stated, "We reject out of hand any contention that a declarant cannot make a spontaneous declaration to a person after having spoken previously to another." *House*, 141 Ill. 2d at 386. Moreover, with respect to statements made in response to a question, the supreme court has indicated that "[a]lthough a statement made in response to persistent interrogation might not be admitted under the spontaneous declaration exception [citation], the fact that a statement was made in response to a question does not necessarily destroy spontaneity." *Williams*, 193 Ill. 2d at 353; see, *e.g.*, *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 37 (holding that "the fact that [the declarant] answered questions posed by the 911 dispatcher [did not] destroy[ ] the spontaneity of her statements or show[ ] an opportunity for

- 12 -

reflection"). Thus, we reject defendant's argument that because C.L.'s statements to Officer Lohmeyer were made in response to his questioning and after she had spoken to Schmitt, they were not excited utterances. See, *e.g.*, *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) ("[T]he opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels.").

¶ 54        Further, we find it was not arbitrary or unreasonable for the trial court to conclude there was an absence of time for C.L. to fabricate her statements to Officer Lohmeyer. C.L. made her statements to Officer Lohmeyer at the scene of the crime. See *Sutton*, 233 Ill. 2d at 108 (finding the declarant "[c]learly" did not have time to fabricate his statements because he "made his statements to the officers at the scene"). She had just been carjacked, thrown down a flight of stairs, sexually assaulted, and threatened with death. See *id.* (stating courts must take into consideration "the nature of the event"). When C.L. made her statements, she was sitting on her living room floor on a blanket with blood on it that had come from "her genital region"; she was also crying, distraught, and, according to Officer Lohmeyer, appeared to be in a state of shock. See *id.* (stating courts must consider "the mental and physical condition of the declarant"). Moreover, only approximately 16 minutes had passed since her conversation with Schmitt. See, *e.g.*, *People v. Lisle*, 376 Ill. App. 3d 67, 78 (2007) (finding that 18 minutes was an insufficient amount of time for the declarant to fabricate his statement). Under these circumstances, it would be reasonable to conclude that C.L. did not spend the time between the startling occurrence and her statements to Officer Lohmeyer contemplating a fabricated version of the horrific events she had just experienced. See *People v. Gacho*, 122 Ill. 2d 221, 241 (1988) ("We believe it is inconceivable *** that [the victim] would have spent the time under these conditions to attempt to fabricate a story or statement about the event."). Accordingly, we find the trial court did not

abuse its discretion in concluding C.L.'s statements to Officer Lohmeyer were excited utterances "made while the excitement of the event predominated." *Sutton*, 233 Ill. 2d at 107.

¶ 55                              b. C.L.'s Statements to Schmitt

¶ 56        Defendant also maintains that C.L.'s statements to Schmitt were not excited utterances because "C.L. provided a detailed account of what had occurred only after *** she was given a gun and emergency services had been summoned, destroying the spontaneity of the narrative."

¶ 57        We find it was not arbitrary or unreasonable for the trial court to conclude there was an absence of time for C.L. to fabricate her statements to Schmitt. Initially, we note that C.L.'s statements to Schmitt were made at the first opportunity to speak, which supports a finding that they were made spontaneously. See, *e.g.*, *Williams*, 193 Ill. 2d at 352 ("[T]he fact that a declarant's statement is made at the first opportunity to speak supports a finding of spontaneity."). Also, as discussed above with respect to the statements she made to Officer Lohmeyer, C.L. made the statements to Schmitt at the scene of the crime and while under significant physical and emotional distress. See *Sutton*, 233 Ill. 2d at 108. Moreover, the fact that C.L. expressed her concern that the assailants would return, and that Schmitt gave her a gun in response, strongly supports a finding that "the statement was made while the excitement of the event predominated." *Id.* at 107. Accordingly, we find the trial court did not abuse its discretion in concluding C.L.'s statements to Schmitt were excited utterances.

¶ 58                              C. Confrontation Clause

¶ 59        Next, defendant contends that C.L.'s statements to Schmitt and Officer Lohmeyer were testimonial in nature and their admission into evidence therefore violated his constitutional right to confront the witnesses against him. "Whether a defendant has suffered a violation of the

confrontation clause presents a question of law and is subject to *de novo* review." *Kinnerson*, 2020 IL App (4th) 170650, ¶ 40.

¶ 60                                    1. *The Law*

¶ 61        "The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him.' " *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (quoting U.S. Const., amend. VI). In *Crawford*, 541 U.S. at 51, the Supreme Court explained that "witnesses," under the confrontation clause, are those "who bear testimony," and it defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." It thus interpreted the confrontation clause to prohibit the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54; see *Davis v. Washington*, 547 U.S. 813, 821 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."). However, "*Crawford* did not offer an exhaustive definition of 'testimonial' statements. Instead, *Crawford* stated that the label 'applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.' " *Clark*, 576 U.S. at 243-44 (quoting *Crawford*, 541 U.S. at 68).

¶ 62        "[T]he most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). Whether a statement made in response to police interrogation is "testimonial"

for purposes of the confrontation clause depends on "the primary purpose of the interrogation." *Id.* at 370. When the circumstances objectively indicate that "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," the statement is not testimonial. *Davis*, 547 U.S. at 822. On the other hand, "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," the statement is testimonial for confrontation clause purposes. *Id.*

¶ 63          "To determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' [citation], which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Bryant*, 562 U.S. at 359. The Supreme Court has summarized the "primary purpose" test as follows:

> "As we suggested in *Davis*, when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. *** [T]he existence and duration of an emergency depend on the type and scope of danger posed to the

- 16 -

victim, the police, and the public." *Id.* at 370-71.

"In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " *Clark*, 576 U.S. at 244 (quoting *Bryant*, 562 U.S. at 358).

¶ 64                                   2. *This Case*

¶ 65        Defendant argues that C.L.'s statements to both Officer Lohmeyer and Schmitt were "testimonial" under the confrontation clause.

¶ 66                         a. C.L.'s Statements to Officer Lohmeyer

¶ 67        Defendant contends "C.L.'s statements to [Officer] Lohmeyer were testimonial under the primary purpose test because" they "were made in response to police questioning when there was no ongoing emergency" and they "described past events in great detail for the purpose of assisting the Sheriff's Office in investigating those events." He maintains the statements "are analogous to the statements the *** Supreme Court deemed testimonial in" *Davis*, because "C.L. made the statements when [Officer Lohmeyer] knew the suspects were not on the scene and there was no ongoing threat to C.L." We disagree and, as discussed below, find instead that C.L.'s statements to Officer Lohmeyer are distinguishable from the testimonial statements in *Davis* and akin to the nontestimonial statements in *Bryant*.

¶ 68        In *Davis*, police officers responded "to a 'reported domestic disturbance' at the home of Hershel and Amy Hammon." *Id.* at 819. Amy told the officers that everything was fine, and she allowed them to enter the house. *Id.* One of the officers questioned Hershel in the kitchen, while "the other went to the living room to talk with Amy, and again asked her what had occurred." (Internal quotation marks omitted.) *Id.* The officer with Hershel later testified that Hershel "became angry when [the officer] insisted that he stay separated from Mrs. Hammon so

that [they] can investigate what had happened." (Internal quotation marks omitted.) *Id.* at 820. After Amy told the officer her account, she then completed and signed, at the officer's request, a "battery affidavit," describing what had occurred. *Id.* On appeal, the Supreme Court held that Amy's statements were testimonial because it was "entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged." *Id.* at 829. The Supreme Court also found that "[t]here was no emergency in progress" because "the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything" and "[w]hen the officers first arrived, Amy told them that things were fine [citation] and there was no immediate threat to her person." *Id.* at 829-30. Further, the Supreme Court relied on the fact that Amy's interrogation "was formal enough that [it] was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his 'investigat[ion].' " *Id.* at 830.

¶ 69    In *Bryant*, police officers responded to a report that a man had been shot. *Bryant*, 562 U.S. at 349. "At the scene, they found the victim, Anthony Covington, lying on the ground next to his car in a gas station parking lot. Covington had a gunshot wound to his abdomen, appeared to be in great pain, and spoke with difficulty." *Id.* The officers "asked him 'what had happened, who had shot him, and where the shooting had occurred.' " *Id.* "Covington stated that 'Rick' shot him" and "indicated that he had a conversation with Bryant *** through the back door of Bryant's house. Covington explained that when he turned to leave, he was shot through the door and then drove to the gas station, where police found him." *Id.* The conversation "ended within 5 to 10 minutes when emergency medical services arrived. Covington was transported to a hospital and died within hours." *Id.*

- 18 -

¶ 70        On appeal, the Supreme Court held that the statements were not testimonial "[b]ecause the circumstances of the encounter as well as the statements and actions of Covington and the police objectively indicate that the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.' " *Id.* at 377-78 (quoting *Davis*, 547 U.S. at 822). The Supreme Court "first examine[d] the circumstances in which the interrogation occurred" and concluded there was an ongoing emergency when the police arrived at the gas station because "[n]othing Covington said to the police indicated that the cause of the shooting was a purely private dispute or that the threat from the shooter had ended." *Id.* at 371-72. It reasoned, "The potential scope of the dispute and therefore the emergency in this case thus stretches more broadly than [the private dispute] at issue in *** [*Davis*] and encompasses a threat potentially to the police and the public." *Id.* at 373. Next, in examining the statements and actions of the parties, the Supreme Court noted that when Covington made the statements, he "was lying in a gas station parking lot bleeding from a mortal gunshot wound" and "was obviously in considerable pain and had difficulty breathing and talking." *Id.* at 375. It thus declined to "say that a person in Covington's situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.' " *Id.* (quoting *Davis*, 547 U.S. at 822). As for the actions of the police officers, the Supreme Court found that through their questioning, "they solicited the information necessary to enable them 'to meet an ongoing emergency.' " *Id.* at 376. Finally, the Supreme Court "consider[ed] the informality of the situation and the interrogation," ultimately concluding "[t]he informality suggest[ed] that the interrogators' primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted Covington to or focused him on the possible future prosecutorial use of his statements." *Id.* at 377.

¶ 71　　　　　Here, we find C.L.'s statements to Officer Lohmeyer were not testimonial. The circumstances in which the interrogation occurred in this case demonstrate there was an ongoing emergency. Unlike in *Davis* —which "involved domestic violence, a known and identified perpetrator, and *** a neutralized threat"—nothing C.L. said to Officer Lohmeyer indicated that the cause of the assault "was a purely private dispute or that the threat from [defendant] had ended." *Id.* at 364, 372. As was the case in *Bryant*, neither C.L. nor Officer Lohmeyer knew of defendant's location at the time of their conversation, meaning the "potential scope of the dispute and therefore the emergency *** stretche[d] more broadly than [the private dispute] at issue in *Davis* *** and encompasse[d] a threat potentially to the police and the public." *Id.* at 373. Indeed, Officer Lohmeyer testified that after arriving at the scene, his primary concern was "community safety" and trying to figure out "[w]here this guy is at" in order to "stop any future problems." Moreover, when C.L. made her statements, she was sitting on her living room floor on a blanket with blood from "her genital region" on it; she was also crying, distraught, and, according to Officer Lohmeyer, appeared to be in a state of shock. Like the Supreme Court concluded in *Bryant*, "we cannot say that a person in [C.L.'s] situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.' " *Id.* at 375. Officer Lohmeyer's questions to C.L.—asking her to recount what had happened and to provide a description of the assailants—also mirror the officers' questions in *Bryant* because "they solicited the information necessary to enable them 'to meet an ongoing emergency.' " *Id.* at 376; see *Davis*, 547 U.S. at 827 ("[T]he initial interrogation conducted in connection with a 911 call *** is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance."). Finally, the informality of the questioning supports a finding that C.L.'s statements were not testimonial. It

was unstructured, it occurred at the scene of the crime, and there was nothing formal—like the "battery affidavit" signed by the declarant in *Davis*—that "would have alerted [C.L.] to or focused h[er] on the possible future prosecutorial use of h[er] statements." *Id.* at 377. Thus, we find C.L.'s statements to Officer Lohmeyer were not testimonial for purposes of the confrontation clause.

¶ 72                                    b. C.L.'s Statements to Schmitt

¶ 73          Defendant also argues that C.L.'s statements to Schmitt were testimonial because they were made (1) "after 911 had been called," (2) "in anticipation of imminent police investigation," and (3) "in an effort to recount the facts of a past crime in order to identify or provide evidence to convict the perpetrator."

¶ 74          In *Clark*, the Supreme Court addressed for the first time the question of "whether statements to persons other than law enforcement officers are subject to the Confrontation Clause." *Clark*, 576 U.S. at 246. It "decline[d] to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment," finding instead that such statements "could conceivably raise confrontation concerns." *Id.* at 246, 249. However, the Supreme Court emphasized that "[c]ourts must evaluate challenged statements in context, and part of that context is the questioner's identity. [Citation.] Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id.* at 249. In resolving the specific issue before it, the Supreme Court held that the statements of a three-year-old child—made in response to questioning from his preschool teachers, who suspected he was being abused—were not testimonial because the "statements occurred in the context of an ongoing emergency involving suspected child abuse" and "[t]here [wa]s no indication that the

- 21 -

primary purpose of the conversation was to gather evidence for \*\*\* prosecution." *Id.* at 246-47.

¶ 75    Here, we find that C.L.'s statements to Schmitt were not testimonial. Importantly, Schmitt, who was acting as a private citizen and concerned husband, was not someone "principally charged with uncovering and prosecuting criminal behavior," and, as a result, C.L.'s statements to him were "significantly less likely to be testimonial than statements given to law enforcement officers." *Id.* at 249. Having already concluded that C.L.'s statements to Officer Lohmeyer were not testimonial, we likewise conclude that her statements to Schmitt—made in the context of an ongoing emergency and prior to the arrival of law enforcement—were not testimonial.

¶ 76                               III. CONCLUSION

¶ 77    For the reasons stated, we affirm the trial court's judgment.

¶ 78    Affirmed.